**SOUTHERN RAILWAY COMPANY,**
**Plaintiff–Appellee,**

v.

**AMERICAN TRAIN DISPATCHERS**
**ASSOCIATION, Defendant–**
**Appellant,**

**Railway Labor Executives Association,**
**Amicus Curiae. (Two Cases).**

Nos. 90–2013, 90–2018.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1990.

Decided Nov. 1, 1991.

Gordon Pier MacDougall, Washington, D.C., argued (Jefferson V. Smith, Jr., Carter, Smith, Merriam, Rogers & Traxler, Greenville, S.C., on brief), for defendant-appellant.

Richard Edelman, Highsaw, Mahoney & Clarke, P.C., Washington, D.C., argued (John O'B. Clark, Jr., on brief), for amicus curiae.

Jeffrey Stephen Berlin, Richardson, Berlin & Morvillo, Washington, D.C., argued (Gregory W. Stevens, Frank H. Gibbes, III, Rainey, Britton, Gibbes & Clarkson, P.A., Greenville, S.C., William P. Stallsmith, Jr., Norfolk, Va., on brief), for plaintiff-appellee.

Before RUSSELL and MURNAGHAN, Circuit Judges, and YOUNG, Senior District Judge for the District of Maryland, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

This suit was filed by appellee Southern Railway Company ("Southern") to enjoin the American Train Dispatchers' Association ("Union") from pursuing resolution of a dispute before the National Railroad Adjustment Board ("Adjustment Board"). Southern asserted that, under the Railway Labor Act ("RLA") the matter submitted to the Adjustment Board had been committed to the exclusive jurisdiction of another board, the National Mediation Board ("Mediation Board"). The district court held in favor of Southern, concluding that the Adjustment Board was without statutory authority to decide the dispute submitted to it by the Union. The court issued a permanent injunction requiring the Union to withdraw the matter from the Adjustment Board. We affirm.

### I.

This case arises at a time in the railroad industry when railroad labor unions are seeing, on a nation-wide basis, continually decreasing memberships. One of these unions, the American Train Dispatchers' Association, has decided to assert a claim that certain management positions at the Atlanta, Georgia, station of Southern Railway have been wrongly classified.[1] These positions, designated "Superintendents, Transportation–Locomotive" ("STL"), had been classified as management positions for nearly a quarter of a century by the time the Union brought its reclassification request. As managers, the STLs are not represented by any labor organization, and their work is not subject to a collective

---

1. Southern's records indicate that the only other request by the Union to reclassify the STLs as train dispatchers was asserted in 1985; however, the request was withdrawn, "without prejudice," shortly after it was made. The complaint at issue in the present case was filed with Southern on March 14, 1988.

bargaining agreement. The Union, however, now seeks to have the classification of these positions changed to dispatcher. The result would be that the current STLs, to continue performing the same work, would be required to become dispatchers. The eligibility of these employees to continue working in the STL positions would be determined according to their seniority as established under a collective bargaining agreement known as the "Schedule Agreement." [2]

In attempting to have the positions reclassified, the Union has exercised rights and procedures set forth in another collective bargaining agreement, entitled the "National Agreement of May 27, 1937, as revised May 30, 1979." The agreement, to which both the Union and Southern are parties,[3] is generally known as the "37/79 Agreement." Certain provisions of the 37/79 Agreement provide a framework whereby railroad employees can seek resolution of matters relating to their working conditions. Specifically, paragraph four of the Agreement provides that "[a]ny Train Dispatcher shall have the right to bring to the attention of the management, directly or through his designated and authorized representative, any conditions or practices ... involving working conditions of train dispatchers." Under the Agreement, the dispatchers are to make their initial complaints directly to their employers. If a dispatcher is unsatisfied with the result of this direct complaint, the Agreement provides a procedure under which the dispatcher can appeal the complaint to a joint labor-management committee ("the Joint Committee"). The Joint Committee consists of three train dispatcher representatives and three railroad representatives, each with equal voting power.

Consistent with the procedures set forth in the 37/79 Agreement, the Union first submitted its request for reclassification directly to Southern. In its complaint, the Union quoted paragraph three of the Agreement, which provides: "Positions, the duties of which fall within the scope of the Train Dispatcher Group, as the duties of that group are described by the Interstate Commerce Commission in its Order ... shall be properly classified." The Union's complaint stated, "Pursuant to the provisions of such paragraph (3), this is to request that the following positions be properly classified: 'Superintendent, Transportation–Locomotive, Atlanta Control Center.' " [4] Southern reviewed the complaint, but refused to reclassify the STL positions.

The Union then proceeded to the next step outlined in the 37/79 Agreement, submission of an appeal of Southern's decision to the Joint Committee. Southern objected to submission of the appeal to the Committee on grounds that the Committee lacked jurisdiction to decide the appeal. Under the 37/79 Agreement, the Committee has jurisdiction only to decide disputes brought by or on behalf of dispatchers. Southern argued that the dispute raised by the Union, however, was on behalf of the STLs, who are not dispatchers. Southern sent a letter to the Chairman of the Joint Committee, stating that "Southern has never agreed, in the National Agreement or elsewhere, to empower the Joint Committee to resolve any questions pertaining to Southern's employment of STLs." [5]

Rather than await a determination by the Joint Committee on Southern's jurisdictional challenge, the Union withdrew its complaint, "without prejudice," and submitted the question of the Joint Committee's jurisdiction to the National Railroad Adjustment Board. The action with the Adjust-

2. Article 4, ¶ e of the Schedule Agreement provides that, "In filling positions covered by this agreement, ability being sufficient, ... seniority as train dispatcher shall govern."

3. A number of carriers in addition to Southern are also signatories to this agreement.

4. Specifically, the Union requested that the positions be "classified as Assistant Chief, Night Chief, or Chief Train Dispatcher." These titles are found in the Interstate Commerce Commission ("ICC") order referred to in paragraph three of the 37/79 Agreement.

5. Letter from R.S. Spenski, of Southern, to E.S. McKeown, Chairman of the Joint Committee (Oct. 12, 1988).

ment Board was initiated by the Union's filing of a "notice of intent to file an *ex parte* submission," pursuant to Section 3, First, of the Railway Labor Act, 45 U.S.C. § 153, First. Southern then filed this civil action in district court, seeking to enjoin the Union from going forward in the Adjustment Board proceeding on the grounds that the Adjustment Board was without statutory authorization to decide the matter.

Unlike other labor statutes, such as the National Labor Relations Act, the Railway Labor Act divides authority for resolving disputes between two different national Boards.[6] Those disputes classified as "representation disputes" are to be decided by the National Mediation Board, 45 U.S.C. § 152, Ninth, while those disputes classified as "minor disputes" are to be decided by the National Railroad Adjustment Board. *See* 45 U.S.C. § 153, First, (i). By specifically assigning certain types of disputes to different Boards, the Act grants authority which is separate and exclusive. Neither Board is granted authority in the Act to decide disputes that have been committed to the jurisdiction of the other Board. Southern asserted before the district court that the matter submitted by the Union to the Adjustment Board is a representation dispute, the type of dispute which only the National Mediation Board has authority to decide. Thus, Southern argued, the Adjustment Board is without jurisdiction to hear the matter.

In characterizing the matter as a representation dispute, Southern asserted in its complaint that, to have standing to bring an action affecting the STLs, the Union must be found to be a representative of the STLs. Deciding this question, whether the Union is the representative of the STLs, would obviously involve the Adjustment Board in a representation dispute. The Union's response to this argument was that it was bringing the action on behalf of existing dispatchers. Thus, the Union ar-

gued, deciding whether the Joint Committee has jurisdiction merely required that provisions of the 37/79 Agreement be interpreted and enforced, making the dispute a "minor dispute," one properly before the Adjustment Board.

The parties filed cross-motions for summary judgment. After hearing oral argument on the motions, the district court found that the matter which the Union had submitted to the Adjustment Board was a representation dispute. The court so concluded for two reasons. First, and most obvious, if the Union is successful in having the thirteen STL positions reclassified as dispatcher positions, the Union will have added those thirteen positions to the reach of its representation. Based on evidence offered by Southern, the district court concluded that the newly reclassified STL positions would be filled by Southern, meaning that Southern would be free to allow the current STLs to remain in their original positions. These thirteen incumbents would become, upon reclassification, train dispatchers, subject to the requirement of paying Union dues and subject to the procedure for bidding for jobs under the seniority provisions of the Schedule Agreement.

Second, the 37/79 Agreement allows the Committee to decide only those complaints involving the "working conditions of train dispatchers." Thus, to resolve the question of the Joint Committee's jurisdiction, the Adjustment Board would be required to decide whether the complaint regarding the STLs stated a claim regarding the "working conditions of dispatchers." In deciding this question, the Adjustment Board would be determining whether the STLs are dispatchers and so within the scope of the Union's representation. Therefore, the court held, the dispute was outside the jurisdiction of the Adjustment Board because the dispute was a representation dispute, one that the Railway Labor Act required to be resolved by the National Medi-

---

6. The Act also allows invocation of Special Boards or Emergency Boards in limited circumstances, but those boards, unlike the national boards, are temporary. *See* Railway Labor Act, § 10, 45 U.S.C. § 160 (discussing emergency

boards); *Consolidated Rail Corp. v. Railway Labor Executives' Association,* 491 U.S. 299, 303, 109 S.Ct. 2477, 2480, 105 L.Ed.2d 250 (1989) (discussing special boards established by agreement of the employer and the unions).

ation Board. The court permanently enjoined the Union from pursuing the dispute before the Adjustment Board and required the Union to withdraw the matter.

The Union appeals, arguing that the matter submitted to the Adjustment Board was not a representation dispute, but a "minor dispute." The Union also challenges the district court's subject matter jurisdiction to intervene in the Adjustment Board proceeding, and asserts that Southern lacked standing to seek judicial relief.

## II.

■ Disputes under the Railway Labor Act are of two kinds: those concerning the terms of collective bargaining agreements, and those concerning the proper representative for a group of employees. Disputes of the first type, those concerning the terms of collective bargaining agreements, are divided into the subcategories "major disputes" and "minor disputes." Disputes of the second type are called "representation disputes." The parties agree that a major dispute is not involved here, leaving only the question of whether the dispute submitted by the Union is a minor dispute or a representation dispute. Minor disputes arise "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153, First, (i). Such disputes are of a type that they "may be conclusively resolved by interpreting [an] existing agreement." *Consolidated Rail Corp. v. Railway Labor Executives' Association*, 491 U.S. 299, 305, 109 S.Ct. 2477, 2481, 105 L.Ed.2d 250 (1989). Representation disputes involve determinations as to whether a particular labor organization is, or should be, the representative of

particular employees for purposes of collective bargaining. 45 U.S.C. § 152, Ninth. If, however, a dispute involves an overlap between a minor dispute and a representation dispute, the matter is to be resolved exclusively by the National Mediation Board. *Independent Union of Flight Attendants v. Pan American World Airways*, 664 F.Supp. 156, 158 (S.D.N.Y.1987), *aff'd*, 836 F.2d 130, 131 (2d Cir.1988) ("We affirm for substantially the reasons stated by the district court."); *see also Flight Engineers' International Association v. Pan American World Airways*, 896 F.2d 672, 673 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990).

Proper classification is important because the Act assigns disputes to the jurisdiction of different Boards depending on the nature of the dispute. If a dispute is a minor dispute, it is to be submitted to the Adjustment Board.[7] If a dispute is a representation dispute, it must be submitted to the National Mediation Board.[8] Because each of the two Boards is specifically assigned a certain type of dispute, the jurisdiction of each Board to hear the dispute assigned to it is separate and exclusive. The Adjustment Board is not empowered by the statute to hear representation disputes, and the Mediation Board lacks the statutory authority to hear minor disputes.[9]

■ Here, the Union has submitted to the Adjustment Board a dispute that is plainly a representation dispute. Before the Union filed its complaint in 1988, the STLs had worked as management employees for over twenty-three years and were never subject to a collective bargaining agreement. During that time, no one had questioned their status as management employees, and there had been no attempt by

---

7. If the parties so choose, however, the dispute can be decided by a special adjustment board "established by the employer and the unions representing the employees." *Consolidated Rail*, 491 U.S. at 303–04, 109 S.Ct. at 2480–81.

8. The National Mediation Board also has some authority over "major disputes." *See Burlington Northern Railroad v. Brotherhood of Maintenance of Way Employees*, 481 U.S. 429, 444, 107 S.Ct. 1841, 1850, 95 L.Ed.2d 381 (1987).

9. The only exception is that the Mediation Board is granted authority to determine one kind of minor dispute. If called upon by a party, the Mediation Board may interpret "any agreement reached through mediation." *Consolidated Rail*, 491 U.S. at 304 n. 4, 109 S.Ct. at 2481 n. 4.

the Union to seek to represent them.[10] But now, in a time of dwindling Union memberships and loss of dispatcher positions, the Union has suddenly decided that the STL positions should be reclassified. The reclassification that the Union seeks would change the designation of these positions from management to dispatcher and, accordingly, would make available to the Union's existing members opportunities for new positions. It is clear from these facts that at the heart of the Union's reclassification request lies a representation dispute.

The Union contends that the dispute is not a representation dispute and attacks the reasoning of the district court which led to a conclusion otherwise. The Union's argument is based on a dispute over who would fill the STL positions if the positions were reclassified. Specifically, the Union criticizes the district court's finding that, if the positions were reclassified, Southern would be free to fill the positions as it chose, even if that meant allowing the current employees working as STLs to retain their positions. The Union disagrees with this finding on the basis of the collective bargaining agreement known as the "Schedule Agreement." The Union asserts that, upon reclassification, the current employees would be "ousted" from their STL positions and replaced with existing dispatchers. Thus, the Union argues, it would not be adding a single new member. Instead, the Union would merely be shifting existing members to different jobs. The Union would still be representing exactly as many train dispatchers after reclassification as it did before reclassification.

Who would fill the STL positions in the event of reclassification is not clear. The district court accepted as "uncontroverted"

Southern's statement that the current employees serving as STLs could continue to work as STLs. However, contrary to the district court's characterization of the matter as uncontroverted, the question of who would fill the positions upon reclassification *has* been disputed by the Union. The Union contends that the STL positions, once classified as "dispatcher" positions, would "be filled by employees holding seniority as train dispatcher."[11] The current STLs, who are not dispatchers, would then be ousted from their jobs to make the positions available to existing dispatchers. We conclude that the Union's explanation of how the STL positions would be filled demonstrates the existence of a representation dispute.[12]

Assuming the Union is correct, and the current STLs are ousted, the Union will acquire thirteen new positions. The skills that the STLs will retain from their former jobs will now fall under the category of "dispatcher." Thus, if the STLs want to work in positions using the skills acquired as STLs, they must become dispatchers. Upon becoming dispatchers, they will fall within the scope of the Union's representation. However, as new members, it seems that they would come in at the bottom of the seniority list and, thus, lose their current jobs. Where there is such a direct threat to the jobs of the STLs, these employees should be allowed the opportunity to determine whether they want to be represented by the Union.

The Union also argues that, even though the issue the Union placed before the Joint Committee concerned reclassification, the issue before the Adjustment Board has nothing to do with reclassifica-

---

10. The only exception was a request by the Union to have the position reclassified in 1985; as noted *supra*, the request was withdrawn shortly after it was submitted.

11. Second Declaration of Robert J. Irvin ¶ 5.

12. Under the explanation offered by Southern and accepted by the district court, seniority would not apply such that the current STLs would be ousted from their positions. Southern's argument was that, under its interpretation of the Schedule Agreement, the positions

would be filled according to seniority at the location in question. However, Southern currently has no dispatchers with seniority that would apply to the Atlanta Control Center. With no eligible dispatchers for that location, Southern would be able to fill the jobs with whoever it chose, including the current STLs, even though they would be at the bottom of the seniority list as newly classified dispatchers. Certainly, under this scenario, the Union would acquire additional members within the scope of its representation, the incumbent STLs.

tion. The sole issue before the Adjustment Board is whether the Joint Committee has jurisdiction. To answer this question the Board need merely construe the 37/79 Agreement, a task which does *not*, according to the Union, implicate a representation dispute. We disagree.

The agreement requires, as a prerequisite to Committee jurisdiction, that the dispute brought before the Committee concern the "working conditions of train dispatchers." Determining whether this prerequisite has been met in this case would require the Adjustment Board to decide whether the dispute is one over the working conditions of dispatchers, that class of employees which the Union represents. The Union argues that the dispute is one that concerns solely the working conditions of *existing* train dispatchers and "has no necessary implication regarding the STL positions." This argument ignores the facts. It is the work currently being performed by the STLs that the Union wishes to have reclassified, not work being performed by existing dispatchers. Further, it is the wages, benefits, and responsibilities of STLs that the Union seeks to change by reclassification; the Union does not seek changes in the manner in which existing dispatchers are treated. Most important, it is the current STLs continued right to a job that is directly threatened by the Union's request for reclassification.

Finally, the Union asserts that the dispute is actually a minor dispute, one within the statutory authority of the Adjustment Board, because determining the Joint Committee's jurisdiction merely requires interpretation of the terms of the 37/79 Agreement. We find this argument to be completely without merit. While interpretation of the Agreement may be involved, the dispute clearly implicates representation concerns. It has been established that when a minor dispute and a representation dispute overlap, the matter should go before the Mediation Board. *Flight Engineers' International Association*, 896 F.2d at 673; *Independent Union of Flight Attendants*, 664 F.Supp. at 158.

Where the true nature of the dispute is so plain, we can see no reason to delay submission to the Board specifically empowered to hear the dispute. The dispute is a representation dispute and, as such, must be submitted to the National Mediation Board.

### III.

The Union raises arguments challenging the district court's jurisdiction to decide this case and attacking Southern's standing to bring this action in district court. We find these arguments to be without merit.

First, the Union argues that "the district court has usurped the statutory scheme for testing the jurisdiction of the National Railroad Adjustment Board." The Railway Labor Act expressly allows review of assertions that the Adjustment Board lacked jurisdiction, but only after the Board has rendered a final decision. Thus, according to the Union, the RLA precludes an assertion of jurisdiction by a federal court prior to a final decision by the Adjustment Board. The Union also asserts that the administrative law doctrine of "primary jurisdiction" precludes judicial review at this stage of the Adjustment Board proceeding. While we agree that these arguments would generally preclude review of actions by the Adjustment Board, we find that this case falls within an exception.

In *Champion International Corp. v. EPA*, 850 F.2d 182 (4th Cir.1988), we resolved the very issue that has been presented to us here. In that case, the EPA made arguments similar to those advanced by the Union in the present case. First, the EPA argued "that since it has only assumed issuing authority over Champion's permit and has not made any final determination either to issue or to deny a permit, jurisdiction in this case has been specifically limited by statute." *Id.* at 187. Second, the EPA argued "that review is precluded by the related judicial doctrines of exhaustion of administrative remedies, ripeness, and finality." *Id.* We agreed with the EPA that, generally, the effect of applying either the statutory scheme for review or the administrative law doctrines would be to

"place Champion out of court." *Id.* at 188. We recognized that there was, however, an alternative left to Champion, the argument "that the action of the EPA was so outside its statutory authority that the district court was justified in interrupting agency action." *Id.* Thus, we acknowledged the very narrow exception that "the district court had subject matter jurisdiction to entertain the suit under *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), to the extent that it properly inquired whether the EPA had exceeded its delegated authority." *Champion,* 850 F.2d at 185–86. Applying this exception here, we find that the district court did possess jurisdiction, but only for the narrow purpose of determining whether the Adjustment Board would be exceeding its statutory authority in considering the Union's claim.[13] The district court decided only this issue, and so we conclude that it was acting within its subject matter jurisdiction.[14]

Second, the Union raises, by means of an *amicus* brief of the Railway Labor Executives' Association ("RLEA"), the argument that Southern lacks standing to present this case to the district court. Standing is allegedly absent because Southern is attempting to assert the rights of third parties, the STLs. According to the RLEA, Southern is faced with no injury in being required to appear before the Adjustment Board. The only persons with any potential injury are the STLs, who have not been joined in the proceeding but whose rights may nevertheless be decided in their absence. Thus, the RLEA asserts, Southern's challenge to the Adjustment Board's jurisdiction is really a challenge on behalf of a third party, the STLs. We disagree.

The narrow issue raised in the district court was whether the Adjustment Board was acting outside its authority in asserting jurisdiction over a matter to which Southern was made a party. It would be anomalous to follow a rule that would allow an agency's statutory authority to be challenged, but would deny a party to that dispute standing to raise the issue. Here, Southern is acting on its own behalf in seeking to be released from an improper assertion of jurisdiction by an agency. Further, Southern is seeking to avoid the dedication of time, effort, and money to a proceeding that is manifestly beyond the jurisdiction of the agency hearing it. We find that Southern has standing.

## IV.

For the foregoing reasons, we conclude that the matter raised before the Adjustment Board was a representation dispute, that the court did have jurisdiction to determine whether the agency had clearly exceeded its powers, and that Southern had standing to bring the action in federal district court. Accordingly, the judgment of the district court is

AFFIRMED.

---

**13.** We find our earlier decision in *South Carolina State Ports Authority v. NLRB,* 914 F.2d 49 (4th Cir.1990), to be distinguishable. The statute involved in that case, the National Labor Relations Act, empowers only one national board to resolve disputes, the NLRB. There, it was clear that the NLRB had jurisdiction to hear the type of dispute submitted. The only question was whether one of the parties was properly before the Board. Here, the statute involved, the RLA, assigns different types of disputes to two different national boards with separate and exclusive jurisdiction. Unlike *South Carolina State Ports Authority,* it is clear in the instant case that the board attempting to assert jurisdiction is without authority to hear the *type* of dispute that has been submitted to it.

**14.** The Union argues that the decisions in *AT & T Technologies v. Communication Workers,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), and *Air Line Pilots International v. Delta Air Lines,* 863 F.2d 87, 91 (D.C.Cir.1988), *cert. denied,* 493 U.S. 821, 110 S.Ct. 79, 107 L.Ed.2d 45 (1989), relied upon by the district court, "do not support the District Court's preemptive threshold inquiry into the NRAB's jurisdiction in a proceeding brought under 45 U.S.C. § 153, First." We do not address this contention, having found the district court's intervention in the Adjustment Board proceeding amply supported by the decision of this Court in *Champion.*