Charles A. CAPRARO, Jr., Appellant,

v.

UNITED PARCEL SERVICE CO.

No. 92–5454.

United States Court of Appeals,
Third Circuit.

Argued March 18, 1993.

Decided May 10, 1993.

Alexander W. Ross, Jr. (argued), Rakoski & Ross, P.C., Marlton, NJ, for appellant Charles A. Capraro, Jr.

Matthew R. Westfall, C. Laurence Woods, III, Tony C. Coleman (argued), Debbie D. O'Connell, Westfall, Talbott & Woods, Louisville, KY, David W. MacGregor, Proskauer, Rose, Goetz & Mendelsohn, Clifton, NJ, for appellee United Parcel Service Co.

Before: STAPLETON, ROTH, and LEWIS, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Plaintiff Charles Capraro appeals a grant of summary judgment for defendant United Parcel Service (UPS) in a suit stemming from UPS's termination of Capraro's employ-ment. The district court granted summary judgment to UPS, holding that the state law claims set forth in Capraro's nine count complaint were preempted by the Railway Labor Act (RLA). On appeal, Capraro argues that preemption was inappropriate for three reasons: (a) Capraro's state law claims relied on sources other than the collective bargaining agreement and could be adjudicated without reference to that agreement; (b) as a probationary employee, Capraro had no grievance or arbitration rights under the collective bargaining agreement, and thus, recourse to the RLA-mandated procedure would have been meaningless and futile; and (c) Capraro made out a prima-facie case of anti-union motivation. Because we conclude that the proper forum for Capraro's claims is the statutorily mandated grievance and arbitration procedure and that neither prejudice nor inappropriate predisposition preclude Capraro from effectively availing himself of that procedure (with or without judicial help), we will affirm.

## I.

Capraro was hired as an airplane pilot by UPS on February 5, 1990, and was terminated on January 31, 1991—five days before his status as a "probationary employee," as defined under the collective bargaining agreement,[1] would have ended. During his time at UPS, Capraro received satisfactory performance reviews and was never disciplined. However, on January 31, 1991, Capraro allegedly was called into his supervisor's office, told he had a "bad attitude," and was given the opportunity to resign or be terminated immediately. He was given a one-way ticket back to his home in New Jersey on a flight leaving within the hour.

Capraro was told by both his supervisor and his union representative that he had no arbitration or grievance rights under the collective bargaining agreement. He therefore filed a nine count complaint against UPS.[2] The first three counts—wrongful discharge, breach of contract, and promissory estop-

---

1. The agreement provides: "Crewmembers shall be on probation for the first (1st) twelve months of accumulated service as a crewmember with the Company." App. at 68.

2. The case was originally filed in a New Jersey state court, but UPS removed to the district court pursuant to 28 U.S.C. §§ 1441, 1446.

pel—rely on statements in UPS's policy books and personnel guides and on oral representations Capraro allegedly received when he was hired that he could be fired only for "just cause." Capraro contends that no "just cause" exists here. Count IV of the complaint alleges that UPS's management tortiously interfered with Capraro's contract of employment with UPS. In Count V, Capraro charges that UPS employees defamed him through their statements concerning the reasons for which he was supposedly discharged (i.e., "poor technical skills," a "bad attitude," and "unsatisfactory performance"). Count VI alleges a fraudulent scheme on the part of UPS to fire probationary employees on fabricated charges. In support of this theory, Capraro claims to know of between three and six other probationary employees terminated as he was, and also points to some evidence that the one negative document in his file might have been "fabricated."[3] Counts VII, VIII, and IX allege "outrageous conduct," intentional and/or negligent infliction of emotional distress, and negligence on the part of UPS, arising from the manner in which it terminated Capraro.

The collective bargaining agreement provides in part:

*Period of Probation*

Crewmembers shall be on probation for the first (1st) twelve (12) months of accumulated service as a crewmember with the Company. *Termination of a crewmember's employment during his probationary period for any reason shall result in the removal of such crewmember from the crewmember's seniority list, and such termination or any disciplinary action shall not be subject to the grievance and arbitration provisions of this Agreement.*

\* \* \* \* \* \*

*Discipline and Discharge*

1. (a) If an incident occurs which results in the suspension or discharge of a crewmember, he shall be notified and entitled to a prompt and complete hearing. . . .

(c) Within ten (10) calendar days after receipt of such notice, such crewmember may file a written grievance with the Manager of Flight, or his designee, challenging the propriety of the action taken.

\* \* \* \* \* \*

2. If the grievant is not satisfied with the decision of the Manager of Flight, or his designee, he may appeal such decision to the "United Parcel Service System Board of Adjustment." Such appeal shall be made in writing within fifteen (15) calendar days from the date of receipt by the grievant of the decision of the Manager of Flight, or his designee.

3. *Nothing in this Article shall be construed as extending the rights of this Article to a crewmember during his probationary period.*

\* \* \* \* \* \*

*Extra Contract Agreements*

The Employer agrees not to enter into any agreement or contract with their employees, individually or collectively, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement shall be null and void.

App. at 68–70, Supp.App. at 5 (emphasis added).

An affidavit of Capraro's union representative indicates that he advised Capraro, *inter alia,* as follows:

[t]he Union had just recently attempted to file an arbitration claim on behalf of a similarly discharged probationary pilot, which arbitration claim was promptly rejected by the assigned arbitrator due to the status of that individual as a "probationary employee". I therefore advised Mr. Capraro that any resort to administrative remedies would be utterly futile.

App. at 60. The record does not disclose whether the arbitrator in the prior case refused to hear the arbitration claim or entertained it and denied relief because of the employee's probationary status.

The district court properly exercised jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332. It granted summary judg-

---

**3.** The document in question apparently was dated several days before the event it complained of could possibly have occurred. Capraro argues that the document was "obviously fabricated" and back-dated to an incorrect date.

ment for UPS, holding that the RLA preempted Capraro's claims and that the RLA's grievance and arbitration procedure is mandatory in cases of this kind.

We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Our review of a grant of summary judgment is plenary. *Jefferson Bank v. Progressive Casualty Ins. Co.*, 965 F.2d 1274, 1276 (3d Cir.1992).

## II.

## A.

■ The RLA was passed by Congress, in large part, "to provide for the prompt and orderly settlement of all disputes growing out of the interpretation of application of agreements covering rates of pay, rules, or working conditions" in the industries covered.[4] *Association of Flight Attendants, AFL–CIO v. USAir*, 960 F.2d 345, 347 (3d Cir.1992). In order to accomplish this goal, carriers and their employees are required to establish Boards of Adjustment to resolve so-called "minor disputes"—disputes "growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 184 (1988).[5]

Minor disputes must be submitted to a grievance process and, if unresolved there, to a Board of Adjustment for binding arbitration. Federal courts generally become involved in such disputes only to compel arbitration or to enforce awards resulting from arbitration. *See USAir*, 960 F.2d at 347–48; *see also Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) ("Congress considered it essential to keep these so-called 'minor' disputes within the Adjustment Board and out of courts.").

A natural corollary of the rule that minor disputes must be submitted to the mandatory grievance and arbitration procedure of the RLA is that parties are precluded from obtaining a judicial forum for certain state law claims. As we have recently held, "the mere assertion of an independent state-law claim does not enable a party to avoid arbitration otherwise compelled by the Railway Labor Act, because 'if the resolution of [that] state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law ... is preempted.'" *Pennsylvania Fed'n of Bhd. of Maintenance Employees v. National R.R. Passenger Corp.*, 989 F.2d 112, 115 (3d Cir.1993) (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988)).

Capraro argues that his claims are not based upon the collective bargaining agreement, but upon state law. He suggests that his claims do not require interpretation of the collective bargaining agreement and thus that providing a judicial forum will not "wreak havoc with the general scheme of RLA arbitration"—a fear expressed in cases involving RLA preemption. *See, e.g., Atchison, Topeka, & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 566, 107 S.Ct. 1410, 1416, 94 L.Ed.2d 563 (1987). Capraro notes that his claims implicate New Jersey law designed to promote "fair employment practices" and that the state has a strong policy interest in protecting its citizens through these laws. *Cf. Farmer v. United Bhd. of Carpenters & Joiners*, 430 U.S. 290, 302, 97 S.Ct. 1056, 1064, 51 L.Ed.2d 338 (1977) ("[I]nflexible application of the doctrine [of federal preemption] is to be avoided where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme."). Capraro also cites a number of cases in which the courts have rejected preemption arguments and permitted access to a judicial forum for certain claims by an employee

---

4. Although originally passed to regulate conduct in the railroad industry, the Act has been extended to encompass "common carriers by air" such as UPS. *See* 45 U.S.C. § 181 (1988).

5. Such disputes are denoted "minor" in order to distinguish them from "major" disputes—disputes that "involve the formation and amendment of the contract between the employer and the labor union." *USAir*, 960 F.2d at 348.

against his employer. *See Maher v. New Jersey Transit Rail Operations, Inc.*, 125 N.J. 455, 593 A.2d 750 (1991) (no RLA preemption of claim under state Whistleblower Act); *Buell*, 480 U.S. at 557, 107 S.Ct. at 1410 (no preemption of claims under Federal Employers Liability Act); *Barrentine v. Arkansas–Best Freight*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (no RLA preemption of claim under Federal Labor Standards Act); *Farmer*, 430 U.S. at 290, 97 S.Ct. at 1056 (no NLRA preemption of certain intentional infliction of emotional distress claims).

### B.

We start with the following teaching of the Supreme Court:

> [Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 211, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985).[6]

■ It follows from the policy behind this precept that courts, in applying it, must protect the full range of decisionmaking that is involved in the interpretation of collective bargaining agreements. Thus, a state claim will be preempted in any instance where resolution of the claim would involve determination of an issue that an Adjustment Board might decide on the basis of an interpretation of the collective bargaining agreement, either because the employee's claim or the employer's defense relies on the agreement. *See Consolidated Rail Corp. v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 307, 109 S.Ct. 2477, 2482, 105 L.Ed.2d 250 (1989) ("Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably

justified by the terms of the parties' collective-bargaining agreement."). Moreover, even where neither side relies upon an express provision of the collective bargaining agreement, arbitration is required if either side is advancing a plausible argument based on implied terms evidenced by course and practice under the collective bargaining agreement or the "common law of the shop." *See, e.g., id.* at 311, 109 S.Ct. at 2485 ("[C]ollective bargaining agreements may include implied as well as express terms."); *General Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R.*, 893 F.2d 584, 592 (3d Cir.1990) ("[E]ither express or implied contractual terms, as interpreted through established past practice, will serve to classify a dispute as minor."); *Leu v. Norfolk W. Ry. Co.*, 820 F.2d 825 (7th Cir. 1987) ("Even if the alleged responsibility of the carrier ... arises from a 'course and practice' of the carrier rather than from a specific provision of a collective bargaining agreement, the question of whether that responsibility exists at all requires an interpretation of the collective bargaining agreement."); *see also United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580–82, 80 S.Ct. 1347, 1351–52, 4 L.Ed.2d 1409 (1960) (" '[T]he governmental nature of the collective-bargaining process demand[s] a common law of the shop which implements and furnishes the context of the agreement.' ... [T]he industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." (quoting Archibald Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482, 1498–99 (1959)).[7]

■ As UPS stresses, the collective bargaining agreement in this case is susceptible of an interpretation that the employer may discharge a probationary employee for any reason or for no reason at all. That agreement can also be read to render void any agreements between the employer and one

---

6. While *Allis–Chalmers* is an LMRA case, its reasoning is applicable in the present context.

7. Part of the rationale for referring minor disputes to Adjustment Boards is to ensure that the disputes are resolved by experts in "the common

law of the particular industry." *Railway Labor Executives' Ass'n*, 491 U.S. at 310–11, 109 S.Ct. at 2484 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 579, 80 S.Ct. at 1351).

or more employees which would provide a probationary employee with any degree of job security. If the collective bargaining gives the UPS the right to discharge a probationary employee without cause and renders invalid any conflicting promise in a personnel manual or elsewhere, Capraro's first four claims—wrongful discharge, breach of contract, promissory estoppel, and tortious interference with contract—are, in all likelihood, untenable. It necessarily follows that their resolution requires interpretation of the collective bargaining agreement and that submission to the Adjustment Board, rather than a court, is required.

Our conclusion with respect to Capraro's other claims is the same. The claims that UPS undertook a fraudulent scheme to discharge Capraro for a fabricated reason, that Capraro's discharge constituted "outrageous conduct," that UPS wrongfully inflicted emotional distress, and that UPS discharged Capraro negligently, all require interpretation of the collective bargaining agreement because each presents entirely different issues depending on whether UPS had the right to discharge Capraro without cause under the terms of the collective bargaining agreement. Capraro's defamation claim—that at the time of firing, in the presence of UPS's personnel Capraro was "falsely accused ... of having poor technical skills and ... a bad attitude"—is preempted as well because we believe that an Adjustment Board interpreting this collective bargaining agreement in the context of this case might well imply a privilege on the part of UPS to provide an employee with a candid evaluation of his performance.

In sum, we regard Capraro's claims as complaints about the termination of an employment relationship regulated by the collective bargaining agreement and the RLA. We agree with the Court of Appeals for the Ninth Circuit: "If the basic injury was [an employee's] wrongful discharge, the complaint involves a minor dispute which must

be arbitrated following the procedures of the RLA.... Artful pleading cannot conceal the reality that the gravamen of the complaint is a wrongful discharge." *Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367, 1369 (9th Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). If each time an employee is terminated, he or she could avoid the RLA's mandatory procedure by claiming that the termination was not a violation of the collective bargaining agreement, but rather a breach of some other oral or written representation (such as an employee handbook) or a tortious act (i.e. a fraudulent scheme, outrageous conduct, infliction of emotional distress), the RLA's purposes and procedures would easily be thwarted. The extreme reluctance of other Courts of Appeals to entertain suits purportedly based on state law, but which arguably may involve interpretation of a collective bargaining agreement, is solidly grounded in the need to protect the RLA's basic scheme and purposes. *See, e.g., O'Brien v. Consolidated Rail Corp.,* 972 F.2d 1, 4–5 (1st Cir.1992) ("Congress's intent that industry based grievance and arbitration proceedings be used to resolve labor-management disputes in the railroad industry would be frustrated if employees (or employers) could bring actions requiring interpretation of the collective bargaining agreement in court, based on state law."), *cert. denied,* —— U.S. ——, 113 S.Ct. 980, 122 L.Ed.2d 134 (1993); *Melanson v. United Air Lines, Inc.,* 931 F.2d 558, 561 n. 1 (9th Cir.1991) ("Nearly any contract claim can be restated as a tort claim. The RLA's grievance procedure would become obsolete if it could be circumscribed by artful pleading."), *cert. denied,* —— U.S. ——, 112 S.Ct. 189, 116 L.Ed.2d 150 (1991).

As Capraro points out, there are certain types of claims which have been held to not be preempted by the RLA. However, these narrow exceptions to the general rule of preemption involve circumstances very different from those present here.[8] Here, all of the

8. In *Maher,* the New Jersey Supreme Court held that a claim under the state Whistleblower Act was not preempted because the claim neither relied on a right contained in the collective bargaining agreement nor required interpretation of the agreement. *See Maher,* 593 A.2d at 758.

However, the court also held that plaintiff's claim of handicap discrimination *was* preempted because it could not be resolved without recourse to the agreement. *Id.* at 764–65. In *Buell,* the Court held that the RLA did not preempt claims asserted under the Federal Employers Liability

claims are common law state tort claims arising from the allegedly wrongful discharge; it is hard to imagine many circumstances in which a discharged employee could not assert the same claims as Capraro and thereby attempt to avoid RLA's mandatory recourse to arbitration. Contrary to Capraro's suggestion, we find that his claims cannot be resolved without consideration of the collective bargaining agreement, and that a judicial forum for such "garden variety" state law claims would present a "realistic threat of interference with the federal regulatory scheme." *See Farmer*, 430 U.S. at 305, 97 S.Ct. at 1066. We therefore conclude that the proper forum for claims such as those presented by Capraro is not a court, but rather the grievance and arbitration procedure mandated by the RLA.[9]

### III.

As Capraro points out, there are exceptions to RLA preemption, even where the claims involved would ordinarily be of the

type suited for resolution by the statutorily mandated procedures. In *Childs v. Pennsylvania Bhd. of Maintenance Way Employees*, 831 F.2d 429 (3d Cir.1987), *Masy v. New Jersey Transit Rail Operations, Inc.*, 790 F.2d 322 (3d Cir.), *cert. denied*, 479 U.S. 916, 107 S.Ct. 320, 93 L.Ed.2d 293 (1986), and *Sisco v. Consolidated Rail Corp.*, 732 F.2d 1188 (3d Cir.1984), we delineated three exceptions to RLA preemption: "(1) when the employer repudiates the private grievance machinery; (2) when resort to administrative remedies would be futile; and (3) when the employer is joined in a DFR [duty of fair representation] claim against the union." *Childs*, 831 F.2d at 437 (quoting *Sisco*, 732 F.2d at 1190). *Childs* also added a fourth exception closely related to the third: "where a breach of the DFR by the union causes the employee to lose his right to press his grievance before the Board." *Id.* at 438–39.

Capraro points to the collective bargaining agreement which provides: "termination or any disciplinary action [during an employee's

---

Act, and in *Barrentine*, the Court held that the RLA did not preempt claims under Federal Labor Standards Act. Both of these cases involved federal statutes designed to address specific narrow problems and provide certain minimum standards; the Court found the RLA preemption of either of these statutes would have thwarted their purposes and been contrary to congressional intent. *See, e.g., Buell*, 480 U.S. at 565, 107 S.Ct. at 1415 ("[N]otwithstanding the strong policies encouraging arbitration, 'different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.'" (quoting *Barrentine*, 450 U.S. at 737, 101 S.Ct. at 1443)).

*Farmer* was a suit by a union member against his union and its officials to recover damages for the intentional infliction of emotional distress. The plaintiff alleged that the officials had conducted a campaign of public ridicule, harassment, and discrimination in job referrals against him because of differences over internal union policies. The defendants argued that the plaintiff's claim was preempted by the provisions of the National Labor Relations Act (NLRA) giving the NLRB jurisdiction over unfair labor practices. The Supreme Court concluded that the state claim was not preempted because allowing it to be litigated held "no realistic threat of interference" with the NLRB's fulfilling its responsibilities concerning unfair labor practices. *Farmer*, 430 U.S. at 305, 97 S.Ct. at 1066. The court did note that "the potential for undue interference with federal regulation would be intolerable if

state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts." *Id.* at 306, 97 S.Ct. at 1066. The federal scheme involved in the case before us requires uniform interpretation of a collective bargaining agreement by a tribunal with special expertise. Allowing a court to substitute its judgment about the meaning of a collective bargaining agreement holds far more potential for frustrating that scheme than was involved in *Farmer*.

9. Our conclusion is supported by that of other Courts of Appeals which have held that the RLA preempts "garden variety" common law tort claims arising in the context of an allegedly wrongful discharge, *see, e.g., Grote v. Trans World Airlines*, 905 F.2d 1307 (9th Cir.), *cert. denied*, 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 397 (1990) (preemption of claims of infliction of emotional distress, wrongful termination, breach of contract, and defamation); *Choate v. Louisville & Nashville R.R.*, 715 F.2d·369 (7th Cir.1983) (preemption of infliction of emotional distress claim); *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.), (same), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978), as well as certain other contexts, *see, e.g., Morales v. Southern Pac. Transp. Co.*, 894 F.2d 743 (5th Cir.1990) (preemption of fraud claim); *Calvert v. Trans World Airlines*, 959 F.2d 698 (8th Cir.1992) (preemption of infliction of emotional distress claim); *Baylis v. Marriott Corp.*, 906 F.2d 874 (2d Cir.1990) (preemption of tortious interference with contract claim).

probationary period] shall not be subject to the grievance and arbitration provisions of this Agreement." App. at 68. Similarly, he notes that both his union representative and UPS's management told him that as a probationary employee, he had no right to bring any grievance action; his union also told him that a previous attempt to file a grievance on behalf of a discharged probationary employee had been promptly rejected because of the employee's probationary status. Based on this, Capraro contends that the first two preemption exceptions apply: the employer repudiated the grievance machinery for probationary employees such as Capraro, and any recourse to the grievance process would have been futile. Despite the quoted portion of the collective bargaining agreement and the advice Capraro received from his union and UPS management, UPS insisted in the district court that Capraro did have access to the grievance process and Adjustment Board, even though his substantive rights were severely limited.[10]

The district court rejected Capraro's claim to both exceptions. With respect to the employer repudiation exception, it explained:

> Plaintiff argues that the language in the [collective bargaining agreement] barring probationary employees from arbitrating termination and disciplinary action constitutes grievance-repudiation. The Court, however, finds that a contractual limitation on grievance procedures is not equivalent to repudiation of such procedures; therefore, the Court concludes that the grievance-repudiation exception does not apply.

App. at 87. With respect to the futility exception, the district court, after pointing out that our prior cases dealt with situations in which arbitration was rendered futile by the arbitration board's "predisposition or prejudice," held as follows:

> In response to Plaintiff's argument that arbitration would have been futile, Defendant asserts that although the [collective

bargaining agreement] does not permit a probationary employee to grieve termination or disciplinary actions, it does not completely bar that employee from access to grievance procedures. Defendant represents that Plaintiff "was fully entitled to grieve the fact that he believes UPS fraudulently applied the probationary clause and/or that the facts he alleges in Counts I, II, III and VI of his Complaint converted his probationary status into employment terminable only for 'just cause.'" (Def.'s Reply Br. at 6.) Based on Plaintiff's access to arbitration, and the dissimilarity between the concepts of a limited contractual right, and predisposition or prejudice, the Court finds that the futility exception also does not apply.

App. at 87–88.

We agree with UPS and the district court that the collective bargaining agreement can limit a probationary employee's substantive rights with respect to discharge and thus leave a discharged probationary employee without much to argue when he or she appears before the arbitrator. *See Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 916 (7th Cir.1974) ("The rationality of an employer's having greater freedom to discharge during a probationary or testing period seems obvious."). We also agree, for the most part, with the district court's reading of our cases finding an exception to RLA preemption: we have only permitted access to a judicial forum for an otherwise preempted claim where effective availment of the congressionally mandated grievance and arbitration process was rendered impossible by prejudice, inappropriate predisposition, or some similar not readily curable phenomenon.[11] However, we cannot embrace the district court's acceptance, on a motion for summary judgment, of UPS's representation that Capraro's grievance would have been entertained by the Adjustment Board. Nor can we agree that this collective bargaining agreement, if con-

---

10. UPS interprets the collective bargaining agreement as permitting the Company to discharge probationary employees without just cause.

11. Obviously, the test for "futility" cannot be simply whether the submitted claim has a chance of success. An employee whose substantive

claims are clearly foreclosed by the language of the collective bargaining agreement might argue that submission of his claim to the Adjustment Board would be futile; yet clearly, this is not the sort of futility that would, in itself, warrant access to a judicial forum.

strued to bar a probationary employee from grieving a disciplinary action or termination, is a permissible "contractual limitation on grievance procedures."

■ The collective bargaining agreement clearly can be read to deny a discharged probationary employee such as Capraro access to the grievance and arbitration process. While this is perhaps not a necessary reading and may not have been the intended one, it is at least the most straightforward reading. This is confirmed by the evidence indicating that Capraro's union and supervisor read it in this way, and we cannot blame Capraro for so reading it. Thus, on this record, it appears that there was at least a substantial risk that Capraro would be denied access to the grievance and arbitration process. Nevertheless, we conclude that the possibility that a contractual provision might be used to deny Capraro access to the congressionally mandated process is insufficient to qualify Capraro for an exception to the general rule barring RLA-preempted suits from the courts.

■ As the district court recognized, the RLA reflects a clear decision by Congress that minor disputes should be arbitrated, not litigated. As our preemption exception cases recognize, however, the RLA also reflects a strong congressional interest in seeing that employees are not left "remediless" and without a forum to present their grievances. *Cf. Vaca v. Sipes,* 386 U.S. 171, 185–86, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967). Courts must keep both of these congressional objectives in mind, and one should be sacrificed to the other only when there is no realistic alternative. In those rare instances where meaningful arbitration is rendered impossible by predisposition or prejudice, we have

been forced to allow an employee access to a court because he or she would otherwise be left without a meaningful remedy. But that remedy, being in conflict with congressional intent regarding resolution of minor disputes, is a last resort and should be utilized only when it is impossible for a court to refer minor disputes to the statutorily mandated process without depriving employees of a meaningful remedy. We find this to be a case in which both congressional objectives can be achieved.

As we have earlier noted, the grievance and arbitration process is not optional under the RLA.[12] Congress intended the RLA's procedures, particularly the Adjustment Boards, to be the exclusive means of dealing with minor matters involving the interpretation of a collective bargaining agreement and for all aggrieved employees to have access to such procedures. It necessarily follows that an employer and a union, through a negotiated collective bargaining agreement, cannot deprive a category of employees of access to the grievance and arbitration process. Thus, if the collective bargaining agreement here is read to deny such access, the relevant clauses, to that extent, are invalid and unenforceable. *See Slagley v. Illinois Cent. R.R.,* 397 F.2d 546 (7th Cir.1968) (employee's right to submit grievance to Adjustment Board is "statutory and cannot be nullified by agreement between the carrier and the union"); *see also Elgin, Joliet & E. Ry. v. Burley,* 325 U.S. 711, 740, n. 39, 65 S.Ct. 1282, 1297, n. 39, 89 L.Ed. 1886 (1945) ("[T]he individual employee's rights cannot be nullified merely by agreement between the carrier and the union. They are statutory rights, which he may exercise independently or authorize the union to exercise in his behalf.").[13] There-

12. The Act mandates the establishment of Boards of Adjustment to resolve minor disputes between an employee or group of employees and a carrier. 45 U.S.C. § 184 (1988). If internal grievance processes fail to resolve a dispute, "the dispute may be referred by petition of the parties or by *either party* to an appropriate adjustment board." *Id.* (emphasis added).

13. It is important to distinguish between agreements which limit an employee's substantive rights (e.g., probationary employees may be terminable at will) and agreements which eliminate an employee's procedural rights. While the for-

mer is generally permissible, the latter is not; an employee's right to a hearing before an Adjustment Board is statutorily guaranteed. Contrary to UPS's suggestion, we regard *Conrad v. Delta Airlines* as supporting this proposition. In *Conrad,* the court approved of a contractual provision permitting discharge of probationary employees without a prior investigation or hearing; the agreement did not, however, bar submission of disputes to the Adjustment Board. Indeed, the court specifically noted that to the extent Conrad claimed his discharge violated the collective bargaining agreement, he was required to

fore, if the Adjustment Board were to refuse to entertain Capraro's claim (or if UPS were to refuse to participate in the arbitration proceedings), Capraro would be entitled to a judicial order compelling arbitration.[14] Such an order would serve the competing policies of ensuring that employees are not left remediless, and that minor disputes are resolved through arbitration rather than litigation.

In this suit, all Capraro seeks is a judicial forum to pursue his claims—a forum Congress did not intend him to have. In such a situation, a claimant must show more than that judicial help in compelling arbitration might be necessary for him to gain access to a statutorily designated forum. Where that is all that is shown, the employee has not demonstrated that he is without a meaningful remedy. It is only where the employee is able to show a problem which renders the arbitration process unavailable, with or without judicial help, i.e. where predisposition, prejudice or some similar phenomenon have made impartial arbitration impossible, that access to the courts can be granted.

Based on the current record, it is solely the existence of the Period of Probation and Discipline and Discharge clauses in the collective bargaining agreement that provide any reason to believe Capraro will be denied access to arbitration; there is no indication that the Adjustment Board is contaminated by prejudice or predisposition that would render a fair hearing impossible. Thus, it appears that a judicial order compelling arbitration would provide Capraro with a meaningful remedy. It follows that the district court's rejection of Capraro's attempt to secure a judicial forum must be affirmed.

## IV.

Finally, Capraro, relying on *Conrad v. Delta Airlines Inc.*, 494 F.2d 914 (7th Cir.1974), alleges that he has made out a prima facie case of anti-union animus that should have precluded summary judgment. According to Capraro, he was discharged on fabricated charges to prevent him from receiving "union benefits" that would have accrued once he came off probationary status. We have serious reservations as to whether on the record before us there is any evidence of a legally relevant form of "anti-union animus" which might warrant a judicial forum.[15] However, it is clear to us that the issue of anti-union animus was not pleaded in the complaint or

"litigate the dispute before the appropriate adjustment board." *Conrad*, 494 F.2d at 914.

Even though limits on a probationary employee's substantive rights may give an aggrieved employee limited chance of success before an Adjustment Board, the availability of a hearing before an impartial arbiter is nevertheless important. Where, as here, a discharged probationary employee wants to argue, for any reason, that his case is not within the contemplation of the drafters of the alleged restrictions on his substantive rights, we believe Congress intended that he should be allowed to do so. In addition to the contribution of the process itself to harmonious industrial relations, there may be instances in which the employee will prevail. If, for example, a collective bargaining agreement provides that a probationary employee may be discharged for any reason, a probationary employee who is discharged as a result of mistaken identity may nevertheless be able to secure relief in the course of the grievance and arbitration process.

14. UPS has suggested that the Adjustment Board would entertain Capraro's claim because Capraro is arguing that various extra-contractual representations made him no longer probationary; because the collective bargaining agreement only denies grievance and arbitration rights to probationary employees, the Board would be entitled to hear any claim by an employee alleging that he was not probationary. We do not understand this to be the essence of Capraro's claim. Rather, we understand Capraro's claim to be that although he is clearly a "probationary employee" within the definition of the agreement, even probationary employees have a right not to be discharged for fabricated or non-existent reasons. Furthermore, Capraro's claims concerning the manner of his termination do not involve whether or not he was probationary at all. Because Capraro's right to grieve and arbitrate is statutory and not contractual in nature, he is entitled to present his claims as he wishes and have them heard. He is not required to structure his claims in the constricted manner suggested by UPS in order to come within the jurisdiction of the Adjustment Board.

15. Even if Capraro's allegations that the negative document in his file was "fabricated" and the employer's purported reasons for termination were "fraudulent" are true, they do not in themselves suggest that the motivation for Capraro's termination was anti-union animus.

raised before the district court.[16] In accordance with our rule that "[w]e generally refuse to consider issues that are raised for the first time on appeal," *Newark Morning Ledger v. United States,* 539 F.2d 929, 932 (3d Cir.1976), we decline to rule on this issue.

## V.

The judgment of the district court will be affirmed.

16. Capraro did raise the issue of fraud in his complaint, without mention of "anti-union" animus. To the extent that Capraro argues that the reasons for his termination were fraudulent and fabricated, the issue is one appropriate for arbitration under the RLA's procedures. Determination of what cause, if any, is necessary for Capraro to be terminated, and whether such cause was present here necessarily involve issues of contract interpretation.