**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, et al., Appellants,**

v.

**DELTA AIR LINES, INC.**

No. 88-7054.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1988.

Decided Dec. 16, 1988.

Eugene B. Granof, with whom Gary Green, Washington, D.C., was on the brief, for appellants.

Baruch A. Fellner, with whom William J. Kilberg, Washington, D.C., was on the brief, for appellee.

Before RUTH BADER GINSBURG, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Air Line Pilots Association ("ALPA") brought suit against Delta Air Lines, Inc. in the district court—pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188 (1982)—seeking injunctive relief to compel arbitration before a System Board of Adjustment of disputes allegedly arising from a collective bargaining agreement between the parties. The district court held that the disputes at issue, which concerned the eligibility of two pilots for disability benefits from the Delta Pilots Disability and Survivorship Plan, were not subject to arbitration before the System Board. The court thus granted summary judgment for Delta, and ALPA appealed. We conclude that the disability benefit disputes arguably do arise under the collective bargaining agreement and are thus subject to arbitration before the System Board. Therefore, we reverse the judgment of the district court.

I.

The Railway Labor Act has governed disputes between air carriers and their employees since 1936. 45 U.S.C. § 181 (1982). The RLA provides that "disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions ... may be referred by petition of the parties or by either party to an appropriate adjustment board." 45 U.S.C. § 184. Each carrier has a duty to establish a board of adjustment. *Id.* The statutory grievance procedure is "mandatory, exclusive, and comprehensive," *Brotherhood of Locomotive Engineers v. Louisville & N.R.R.*, 373 U.S. 33, 38, 83 S.Ct. 1059, 1062, 10 L.Ed.2d 172 (1963), and judicial review of a System Board's decision is narrowly limited to three categories provided in the Act. *Union Pacific R.R. v. Sheehan*, 439 U.S. 89, 93, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978); 45 U.S.C. § 153 First (p).[1]

---

1. The Act states that an order of a System Board may be set aside only "for failure of the division to comply with the requirements of [the RLA], for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order." 45 U.S.C. § 153 First (p).

In section 19 of their 1982 collective bargaining agreement, Delta and ALPA established a System Board of Adjustment in order to comply with the RLA. The agreement states that the Board's purpose is to "adjust[ ] and decide[ ] disputes which may arise under the terms of the Pilots' Agreement and which are properly submitted to it." Its jurisdiction includes "disputes between any pilot covered by [the] Agreement and the Company growing out of grievances or out of interpretation or application of any of the terms of [the] Agreement." The Board is composed of four members, two appointed by Delta and two appointed by ALPA. A majority vote of the Board members establishes a final and binding decision on any matter properly before it; in the case of deadlock, the agreement provides for the selection of a fifth Board member from a panel of neutrals established by the parties.

Section 26 of the contract describes retirement, disability, and survivor benefits for the pilots. Two parts of that section are directly implicated in this case. Section 26.A states that "[t]he Company shall pay the full cost of the Delta Pilots Retirement Plan and the Delta Pilots Disability and Survivorship Plan, plans regulated under the Employee Retirement Income Security Act of 1974 ("ERISA"), such plans hereby incorporated by reference into this Agreement," and section 26.C provides that "[a] pilot who becomes disabled prior to his normal retirement date shall be provided a monthly disability benefit from the Delta Pilots Disability and Survivorship Plan equal to fifty percent (50%) of his highest twelve (12) consecutive months of normal earnings during the last thirty-six (36) months of active service as defined in the Plan."

The Delta Pilots Disability and Survivorship Plan provides benefits for pilots employed by Delta. The Plan vests the exclusive power to interpret its terms and the responsibility for carrying out its provisions in an Administrative Committee of at least three members, who are appointed by the Board of Directors of Delta. Of particular relevance to this appeal, section 11.02 of the Plan states that "decisions of the Administrative Committee as to interpretation and application of the Plan shall be final."

Like virtually all employee benefit plans, the Delta Plan is regulated by ERISA, which was passed by Congress in 1974 to establish minimum standards for such plans. 29 U.S.C. § 1001(a) (1982). Administrators of the Plan are designated fiduciaries, *see* 29 U.S.C. § 1102, and ERISA imposes certain duties on them as a matter of federal law. 29 U.S.C. §§ 1102–1113. ERISA also imposes a series of disclosure and reporting requirements to protect the interests of participants and beneficiaries. 29 U.S.C. §§ 1021–1031. Section 502 of ERISA provides for civil enforcement of the various provisions of the Act through actions brought by participants, beneficiaries, and fiduciaries. 29 U.S.C. § 1132(a)(1).

The first of two grievances underlying this dispute involves former Delta pilot Donald R. Hazeltine. Delta discharged Hazeltine on July 23, 1984, after an incident at the Houston airport on July 3, 1984, during which, according to Delta, Hazeltine "created an unnecessary scene with security checkpoint personnel at [the airport] in front of numerous passengers." This episode was the last in a series of events since 1969 which Delta believed made Hazeltine a "constant source of embarrassment to the Company." Hazeltine had been progressively disciplined through suspensions of increased durations, so Delta concluded that termination was warranted after the Houston incident.

Hazeltine appealed the termination of his employment to the System Board, claiming that he should be placed on disability and that his conduct did not justify his termination. The Board sustained Hazeltine's discharge and ruled that the "initial determination of the *medical merits* [of the disability claim] are properly determined by the Administrative Committee of the Delta Pilots Disability and Survivorship Plan." (emphasis added). But the Board concluded that "the grievant shall not be barred from making application for disability under the Delta Pilots Disability and Surviv-

orship Plan; the Administrative Committee of the Plan shall not be barred from considering his application, and that the Administrative Committee shall not be bound by the grievant's current employment status in making its determination." ALPA had sought such a determination, because it feared that the Committee would deny Hazeltine's claim on the ground that he was not disabled at the time of his discharge. When terminated, Hazeltine was arguably not yet "disabled" as that term is defined by both section 26.C.4 of the agreement and section 1.08 of the Plan, because he had not "los[t] his [Federal Aviation Administration] license to fly as an airline pilot," and section 7.01 of the Plan states that "[t]here are no benefits under this Plan in the event of Termination of Continuous Employment."

Hazeltine subsequently applied for issuance of an airman medical certificate from the FAA, which the agency denied on July 18, 1985. He then sought disability benefits under the Plan in August 1985. The Plan's Administrative Committee denied his claim on April 15, 1986, stating that "at the time of the termination of [his] employment with Delta, [Hazeltine] held a first class medical certificate." The Committee reasoned that "the onset of disability must occur during employment," and "no post termination benefits are available under the Plan." Its decision made no mention of the Board's earlier seemingly inconsistent award.

The second underlying grievance was brought by former Delta pilot Earl E. "Ed" Meech. On January 24, 1985, Meech was indicted by a federal grand jury in Dallas, Texas on eleven felony charges of fraud and conspiracy. Delta thereafter suspended him without pay and benefits on February 8, pending resolution of the criminal charges. The company said that the "serious nature of the criminal charges" called into question Meech's "judgment and integrity" and that Meech's preparation of a legal defense would prevent him from giving "undivided attention to [his] duties and responsibilities as a pilot for the Company."

In March 1985, while on suspension, Meech fell from a ladder and seriously aggravated a prior back injury. On the 19th of that month Meech received a "Disability Certificate" from an FAA-certified medical examiner, attesting that Meech was physically unable to perform his job duties. This certificate, however, was not technically equivalent to the denial of an FAA license, which Delta argues is a prerequisite to disability benefits under the Plan and the agreement. In June 1985, Meech was convicted on two felony charges, and Delta converted his suspension into a termination on July 31, 1985. Sometime thereafter, Meech applied for, and was denied, an FAA license.

During his suspension, on July 10, 1985, Meech applied for long term disability benefits under the Plan. Delta denied his claim on August 16, on the ground that his alleged disability commenced after 30 days from the date he was suspended. Although section 4.02 of the Plan, which delineates the requirements for income benefits, does not explicitly include a 30 day limitation period, Delta explained that section 4.02 had been "interpreted to be consistent with the provisions of Section 25.-A.1. of the Agreement." The latter section provides that a pilot is eligible for *short term* weekly disability benefits while under disciplinary suspension only if the disability occurs within the first 30 days of the suspension.

Meech appealed this decision to the Administrative Committee of the Plan, which upheld the decision on a different basis. It wrote to Meech, stating: "With respect to your claim for permanent disability benefits, the Committee noted that through the time of your termination, you had never been denied a first class medical certificate. Denial of such a certificate is required in order to qualify for permanent disability benefits." This is the same reason that the Committee gave for denying Hazeltine's application for benefits.

On May 27, 1986, Hazeltine and Meech both submitted grievances to the System Board for consideration and decision. They alleged that the Administrative Commit-

tee's denials of their disability applications violated the collective bargaining agreement. Delta refused to participate in a Board proceeding, however, because in its view "applications for disability benefits lie exclusively within the province of the Administrative Committee, [and] it is clear that the System Board has no jurisdiction over these matters." ALPA then sued to compel arbitration.

## II.

■ As a threshold matter, ALPA maintains that the district court should not have decided whether the grievances are within the jurisdiction of the System Board. Rather, appellant contends that the Board should determine its own jurisdiction in the first instance—in other words, it has primary jurisdiction to decide its own jurisdiction. The court should rule on the Board's jurisdiction, ALPA argues, *only if* the Board's jurisdiction is challenged *after* it has acted. *See* 45 U.S.C. § 153 First (p). ALPA premises its primary jurisdiction argument on the language of the agreement; section 19.C defines the jurisdiction of the Board, and section 19.G.7 provides that "[t]he Board shall have the authority for the administration and interpretation of this Section of the Agreement."

The Supreme Court has recently announced the general rule—at least in cases arising under the National Labor Relations Act—that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT & T Technologies, Inc. v. Communications Workers of America,*

475 U.S. 643, 649, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986). This is so because "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *Id.* at 648–49, 106 S.Ct. at 1418–19. The Court explained that "[t]he duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty." *Id.* at 649, 106 S.Ct. at 1419 (quoting *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546–47, 84 S.Ct. 909, 912–13, 11 L.Ed. 2d 898 (1964) (citations omitted)).

ALPA argues that the *AT & T* rule should not apply here, because this case arises under the RLA, under which the duty to arbitrate is not only a contractual obligation but a mandatory statutory requirement. We think, however, that the instant dispute really does center on the scope of the parties' contractual grant of jurisdiction to the System Board. As we explained above, the purpose of the Board is to decide disputes arising under the agreement. We have implied previously that arbitration is a matter of contract in an RLA case—at least where a collective bargaining agreement is in effect[2]—because an issue need not be subject to arbitration if there is "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Northwest Airlines v. ALPA,* 808 F.2d 76, 82 (D.C.Cir.1987) (quoting *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80

2. ALPA argues in its brief that any claim founded upon some incident of the employment relationship, whether or not it is covered by the collective bargaining agreement, is a "minor dispute"—a term of art under the RLA—which must be submitted to the System Board. To be sure, the Supreme Court has said that some claims independent of those covered by the agreement are subject to mandatory arbitration. *Elgin, J. & E. R.R. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886 (1945). When there is a collective bargaining agreement in effect (as in this case), however, all disputes that arguably are covered by the agreement are minor disputes under the RLA and must go to the

System Board. *Railway Labor Executives v. Consolidated Rail Corp.,* 845 F.2d 1187, 1190 (3d Cir.1988); *Brotherhood of Locomotive Engineers v. Burlington Northern R.R.,* 838 F.2d 1087, 1091 (9th Cir.1988). Insofar as ALPA argues that the RLA gives it the independent right to take to the Board grievances over Plan applications, its theory is contrary to *Bonin v. American Airlines,* 621 F.2d 635 (5th Cir.1980), which concluded that employees' rights to pension benefits were not arbitrable at all if not arbitrable under the collective bargaining agreement. Moreover, the union's view would undermine the parties' ability to agree to the jurisdiction of the Board through bargaining.

S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960))). We are confronted with the question whether the Hazeltine and Meech grievances "arise under the terms of the Pilots' Agreement"—as required by section 19.A of the compact—in which case they would be within the jurisdiction of the System Board, or whether they are really independent disputes between the pilots and the Plan fiduciaries. The arbitrability question here is, in essence, an issue of contract interpretation, and we thus think *AT & T* applies.

Appellant does not really contend that the agreement provides clear and unmistakable evidence of a contractual intent that the court be ousted of primary jurisdiction to determine arbitrability, and we think that the contract certainly does not so provide. The mere statement that the Board shall administer and interpret the section of the agreement that includes the jurisdictional provision does not satisfy the *AT & T* test. Such general provisions are quite common in labor agreements, and we feel confident that the Supreme Court meant to require something more direct and explicit in order to deprive the courts of jurisdiction to decide the arbitrability issue before the System Board considers it. The district court was thus correct to address the arbitrability dispute, and we turn now to that question.

### III.

Delta asserts that since all claims for disability benefits from the Plan are to be resolved by the Plan's Administrative Committee, denials of such claims are not subject to arbitration before a System Board. The plain language of the Plan, Delta says, shows that it is meant to be administered independently from the collective bargaining agreement. Delta relies on sections 11.01, 11.02, and 11.07 of the Plan, which provide respectively: "The operation and administration of the Plan ..., the exclusive power to interpret it, and the responsibility for carrying out its provisions are vested in an Administrative Committee...." "The decisions of the Administrative Committee as to interpretation and application of the Plan shall be final." The Administrative Committee shall have the power to "interpret the Plan, and decide all questions of eligibility of any Employee to participate in the Plan or to receive benefits under it, its interpretation thereof in good faith to be final and conclusive."

The union, on the other hand, maintains that the System Board has the power to define the relationship between the Administrative Committee and the Board. It contends that the entire Plan is subsumed within, or incorporated by reference into, the collective bargaining agreement. Therefore, according to ALPA, it may insist that any benefit claim under the Plan follow the same grievance machinery as other claims under the contract.

In support of its argument, Delta points to a group of circuit court decisions that have recognized the independence of pension and disability plans from collective bargaining agreements. The leading case is *Bonin v. American Airlines, Inc.*, 621 F.2d 635, 639 (5th Cir.1980), in which the court held that since the employee pension plan involved was "not maintained pursuant to a collective bargaining agreement," jurisdiction over employee pension claims was in the district court under ERISA rather than in the System Board under the RLA. In *Bonin*, the pension plan provided that "neither the interpretation of the Plan nor its administration shall as such be within the jurisdiction" of the collective bargaining agreement. *Id.* This statement, combined with the apparent absence of indication in the collective bargaining agreement of an intent to incorporate the plan, led the court to conclude that the plan was wholly independent.

Other courts have reached similar results in cases involving collective bargaining agreements governed by the NLRA. In *RCA Corp. v. Local 241, International Fed. of Prof. & Tech. Engineers*, 700 F.2d 921 (3d Cir.1983), the court held that where a retirement plan fails to provide an independent basis for mandatory arbitration, and where no provision in the general collective bargaining agreement either brings or seeks to bring the retirement plan within

the ambit of the general agreement, disputes over the retirement plan are not arbitrable. The court stressed that "[t]he mere mentioning of the Retirement Plan in the General Agreement is insufficient reason to construe the Retirement Plan as part and parcel of the General Agreement." *Id.* at 927. Similarly, in *Printing Specialties, Local 680 v. Nabisco Brands, Inc.*, 833 F.2d 102 (7th Cir.1987), the court stated that a "passing reference to the Pension Plan in the collective bargaining agreement does not bring specific pension disputes ... under the umbrella of the arbitration clause of the agreement." *Id.* at 105. Because there was no "clear relationship between the Pension Plan and the collective bargaining agreement," *id.*, the court held that grievances over denials of pension benefits were not arbitrable. Against this background, we proceed to analyze the Hazeltine and Meech grievances.

## A. *The Hazeltine Grievance*

■ Even if no other disputes over eligibility for Plan benefits were subject to arbitration, we think it clear that the facts of Hazeltine's grievance require the System Board to entertain his claim. In his appeal of termination of employment to the Board, Hazeltine sought and received a specific provision in the Board's decision that arguably pertains to his eligibility for disability benefits under the Plan. Such an arbitral decision operates as an interpretation of the original agreement; it might be said therefore that a "Hazeltine clause" concerning the relevant criteria to determine *his* eligibility for disability benefits was incorporated into the contract. *Fournelle v. NLRB*, 670 F.2d 331, 344 (D.C.Cir. 1982) ("[a]n award interpreting a collective bargaining agreement usually becomes a binding part of the agreement....") (quoting F. Elkouri & E. Elkouri, *How Arbitration Works* 377 (1973)); *Local Union No. 9735, UMW v. NLRB*, 258 F.2d 146, 148 (D.C.Cir.1958) (arbitrator's decision generally becomes part of the contract); *Szewczuga v. NLRB*, 686 F.2d 962, 973 n. 84 (D.C.Cir.1982) ("collective bargaining process" includes certain arbitral results as well as the terms of the collective agree-

ment reduced to writing). Delta does not squarely deny that the parties could have agreed in collective bargaining to modify any provision of the pension plan or could do so *ad hoc* for Hazeltine alone. Whether or not Hazeltine could reach the System Board without this earlier Board decision (a question we explore below), the Board's first ruling, which is an interpretation of the collective bargaining agreement, may affect Hazeltine's status vis-a-vis the Plan, and the Board therefore must hear his grievance.

We do not hold that the Board must interpret its prior decision in any particular way. Delta's counsel maintained at oral argument that it was not the intention of the original Board decision to allow Hazeltine to obtain disability benefits regardless of his employment status at the time he was deemed disabled. If the Board finds that contention determinative, it can so rule. Rather, we hold only that because the agreement now contains the equivalent of a collectively bargained term arguably addressing Hazeltine's eligibility for disability benefits, his grievance is within the mandatory jurisdiction of the System Board.

## B. *The Meech Grievance*

■ The Meech grievance raises substantially different questions than the Hazeltine claim, and it comes much closer to presenting the large issue of whether all claims under the Plan are subject to arbitration before the System Board. We conclude that the Board must entertain Meech's grievance, but in doing so we need not decide whether the System Board has jurisdiction over *all* appeals from denials of benefits by the Plan's Administrative Committee.

We have recently explained in an RLA case that doubts about the arbitrability of issues should be resolved in favor of coverage. *Northwest Airlines v. ALPA*, 808 F.2d 76, 82 (D.C.Cir.1987). In order to establish that the System Board has no jurisdiction over Meech's claim, Delta must provide "positive assurance that the arbitration clause is not susceptible of an inter-

pretation that covers the asserted dispute." *Id.* (quoting *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960))). Unlike the company in *Bonin,* we think Delta has failed to offer "positive assurance" that its disability plan is entirely independent from the collective bargaining agreement.

Significantly, the agreement between Delta and ALPA provides that the Plans are incorporated by reference into the agreement. Section 25.A.1 states that "[e]ach pilot ... shall ... be provided with the following group benefits pursuant to the Delta Pilots Disability and Survivorship Plan, and the Delta Pilots Medical Plan, plans ... *hereby incorporated by reference into this Agreement.*" (emphasis added). Likewise, section 26.A.1 says "[t]he Company shall pay the full cost of the Delta Pilots Retirement Plan and the Delta Pilots Disability and Survivorship Plan, ... such plans *hereby incorporated by reference into this Agreement.*" (emphasis added). It is generally held that "[w]hen a document incorporates outside material by reference, the subject matter to which it refers becomes a part of the incorporating document just as if it were set out in full." *Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1428 (9th Cir.1986). Both ALPA and Delta seemed to intend this in section

26.6 of the contract, when they referred to the Plans as "contained herein." An explicit incorporation by reference is a far cry from the "mere mentioning of the Retirement Plan in the General Agreement" that courts have found insufficient to bring pension disputes under the umbrella of collective bargaining agreements in *Nabisco* and *RCA. See, Nabisco,* 833 F.2d at 105; *RCA,* 700 F.2d at 927.

Meech's disability claim, moreover, is based on collectively bargained provisions that appear *both* in the agreement and in the Plan. His request for benefits, as we explained earlier, was eventually denied on the ground that Meech had never been denied a first-class medical certificate before his termination by Delta.[3] Meech now contends that he clearly was disabled before his discharge, even though he had not technically been denied an FAA license. He also maintains that Delta made independent promises in the contract to provide disability benefits to pilots in his situation. The first relevant provision, section 1.08 of the Plan, which defines "disabled" for purposes of benefits, is reproduced in the agreement, at section 26.C.4.[4] Likewise, section 5.01 of the Plan, which provides that "[a] Participant who becomes disabled ... shall be entitled to a monthly income benefit ...," is set forth almost verbatim in section 26.C.1 of the contract.[5] This paral-

**3.** Meech also contends that his grievance is within the jurisdiction of the Board, because it involves a dispute over whether his suspension was properly characterized as a "disciplinary" suspension under sections 18.B and 25.A.1 of the agreement. We need not decide that question, however, because only Delta's original denial of Meech's claim for permanent disability benefits relied on the fact that he had not become disabled during the first 30 days of a "disciplinary suspension." The final resolution of the claim for permanent disability benefits by the Administrative Committee relied solely on the fact that Meech was not disabled at the time of his discharge; it did not rest at all on the nature of Meech's suspension.

**4.** Section 1.08 of the Plan provides:
A Participant shall be considered disabled when he loses his FAA license to fly as an airline pilot, and has been denied restoration of such license by the FAA and has appealed or is in the process of appealing such denial to the FAA at its highest appeal level because

of accidental bodily injury or any sickness or disease, including natural deterioration, which shall result in his being prevented from flying as an airline pilot....
Section 26.C.4 of the agreement states:
A pilot shall be considered disabled when he loses his FAA license to fly as an airline pilot, has been denied restoration of such license by the FAA and has appealed or is in the process of appealing such denial to the FAA at its highest appeal level because of accidental bodily injury or any sickness or disease, including natural deterioration, which shall result in his being prevented from flying as an airline pilot....

**5.** Section 5.01 of the Plan states in relevant part:
A Participant who becomes Disabled in accordance with the definition in Section 1.08 shall be entitled to a monthly income benefit equal to 50% of the average of his highest twelve consecutive months of normal earnings during the last 36 months of active pay status.

lel structure suggests that the key terms in the Meech dispute were products of negotiation and bargaining. *See Nabisco*, 833 F.2d at 105 ("[W]e might reach a different result if Nabisco and the Union had explicitly bargained over the terms of the Pension Plan and made their agreement a part of the collective bargaining agreement.").

The distinction between the instant case and those relied upon by Delta is highlighted by the *Nabisco* court's statement that, in its case, "[t]he collective bargaining agreement *did not incorporate* the provisions of the Pension Plan." *Nabisco*, 833 F.2d at 105 (emphasis added). The ALPA—Delta agreement doubly incorporated the relevant terms of the Plan: it purported to incorporate the whole Plan by reference, and it literally incorporated the terms relating to disability benefits.[6] The plan in *Bonin* gave "positive assurance" that it was separate from the collective bargaining agreement because it stated that "neither the interpretation of the Plan nor its administration shall as such be within the jurisdiction" of the agreement. *Bonin*, 621 F.2d at 639. Here, by contrast, we have indications to the contrary. Thus, unlike the pension plan in *Bonin*, we think that the Delta Plan—at least the part of it reproduced in the contract—is "maintained pursuant to a collective bargaining agreement." *Id.*

In addition to arguing that the Plan's own language shows that it is entirely separate from the agreement, Delta also suggests—unfortunately with no supporting authority—that ERISA prohibits the Sys-

tem Board from reviewing decisions by the Administrative Committee, absent an explicit statement in the Plan that permits such review. In its brief, Delta states rather boldly that "ERISA as it now reads ... requires that the plan itself state that it is subject to the arbitration provision of a collective bargaining agreement," but it refers us to no statutory language in support.[7] On the contrary, the Department of Labor's own regulations imply the opposite. The rules on claims procedure state that: "In the case of a plan established and maintained pursuant to a collective bargaining agreement ... [s]uch plan will be deemed to comply with the provisions of paragraphs (g) and (h) of this section [concerning review procedures] ... if the collective bargaining agreement pursuant to which the plan is established or maintained sets forth ... a grievance and arbitration procedure to which denied claims are subject...." 29 C.F.R. § 2560.503–1(b)(2)(ii) (1986). In short, Delta has not brought anything to our attention establishing that a plan is not "maintained" pursuant to a collective bargaining agreement unless the *plan* itself so states. As we stated earlier, the combined incorporation by reference of the Plan with the duplication of certain Plan terms in the contract satisfy us that this Plan is, at least in relevant part, maintained pursuant to the contract.

Delta also asserts that acceptance of ALPA's position would give the System Board "jurisdiction to compel the Administrative Committee to commit a breach of

Section 26.C.1 of the agreement says:
A pilot who becomes disabled prior to his normal retirement date shall be provided a monthly disability benefit from the Delta Pilots Disability and Survivorship Plan equal to fifty percent (50%) of his highest twelve (12) consecutive months of normal earnings during the last thirty-six (36) months of active service as defined in the Plan.

6. We need not and do not decide in this case whether the agreement's statement that the Plans are "incorporated by reference" is sufficient, in and of itself, to give the System Board jurisdiction over *all* benefit claims.

7. Delta does cite *Sinai Hospital v. National Benefit Fund*, 697 F.2d 562 (4th Cir.1982), for the

proposition that an employer and a union cannot alter the terms of a trust agreement "unless the power to do so was reserved when the trust was created or properly amended." *Id.* at 567. *Sinai Hospital* is inapposite, however, because it involved a national, multi-employer trust fund that received contributions from and provided benefits for the employees of 1500 employers. Obviously, one employer and its employees could not change the terms of a multiemployer trust fund. The court's analysis was limited to trust instruments "such as the one involved in th[at] case." *Id.* It does not seem to apply to the situation in this dispute, where the Plan is designed specifically for a particular employer-employee relationship and is maintained, at least in part, pursuant to the corresponding collective bargaining agreement.

fiduciary responsibilities under ERISA." Although there may exist some hypothetical case where an order of the Board would be in tension with the Administrative Committee's fiduciary responsibilities, we see nothing in ERISA that prohibits a System Board from hearing appeals from decisions of a plan's administrators. The statute itself says that a fiduciary shall discharge his duties "in accordance with the documents and instruments governing the plan insofar as such document and instruments are consistent with the provisions [of ERISA]." 29 U.S.C. § 1104(a)(1)(D). If, as we have said, the agreement governs the terms of the Delta Plan involved in these grievances, the Plan's fiduciaries must act in accordance with rulings of the Board as long as they are consistent with ERISA. If an order of the Board is inconsistent with the fiduciary, disclosure, or other requirements of the statute, a participant, beneficiary, or fiduciary may bring an independent action in the district court under section 502 of ERISA, 29 U.S.C. § 1132 (1982). *ALPA v. Northwest Airlines, Inc.,* 627 F.2d 272, 277 (D.C.Cir.1980) (exclusive System Board jurisdiction over benefit claims does not deprive district court of jurisdiction over claims premised on a violation of ERISA); *Bonin,* 621 F.2d at 639 (same).

Finally, it is important to state what the court is *not* deciding. Our decision should in no way be interpreted as binding on the System Board as it reviews the Meech and Hazeltine grievances. The System Board might well determine that the exclusivity and finality language in the Plan means that all (or some portion) of disputes over the Plan's administration are not normally to be submitted to the System Board. That depends, of course, on how the System Board interprets the Plan's terms—including words like "exclusive" and "final"—which have been brought into its ambit by collective bargaining. The crucial point, it seems to us, is that it is up to the System Board to determine the relationship between the Plan administration and the Board with respect to those aspects of the Plan maintained pursuant to the collective bargaining agreement.[8] As the Supreme Court has made clear, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." *AT & T,* 475 U.S. at 649, 106 S.Ct. at 1419. The ultimate decision on the benefit claims is left to the Board.

\* \* \* \* \* \*

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded to that court with instructions to grant ALPA's request for injunctive relief to compel arbitration before the System Board of the Meech and Hazeltine grievances.

*It is so ordered.*

---

**8.** Delta also complains that adoption of ALPA's position would generate a cumbersome and duplicative mechanism for resolving disability claims. The simple answer to this "problem" is that the parties are free to agree to any procedures that they choose. Even assuming the extra layer of review at the System Board would be Delta's "procedural nightmare" (which we doubt), nothing in the RLA restricts the parties' right to make such a contract.