**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 13, 2010

Lyle W. Cayce
Clerk

No. 08-10807

CAREFLITE

Plaintiff – Counter-Defendant-Appellant

v.

OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION,
AFL-CIO

Defendant – Counter-Claimant–Appellee

CRAIG LEE HILTON

Counter-Claimant–Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before DENNIS and ELROD, Circuit Judges.*

DENNIS, Circuit Judge:

This case involves the scope of a grievance procedure set forth in a collective bargaining agreement between an airline and its pilots' union under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq*. "The RLA, which was extended in 1936 to cover the airline industry, *see* Act of Apr. 10, 1936, ch. 166, 49 Stat. 1189; 45 U.S.C. §§ 181-188, sets up a mandatory arbitral mechanism to

---

* Circuit Judge BARKSDALE heard argument in this case but thereafter recused. The case is being decided by a quorum. 28 U.S.C. § 46(d).

handle disputes 'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994) (quoting 45 U.S.C. § 151(a)).

The first question in this case is whether an airline pilot and his bargaining representative, the Professional Employees International Union, AFL-CIO ("the Union"), who claim that he was wrongfully discharged because he did not timely obtain an Airline Transport Pilot Certificate ("ATP") from the Federal Aviation Administration ("FAA"), may seek redress through the RLA's arbitral mechanism, or whether they must pursue other remedies for wrongful discharge, because the collective bargaining agreement explicitly provides that "termination of employment resulting from a pilot's failure to obtain an ATP within the time requirements of this section is non-grievable and non-arbitrable." We conclude that the grievance concerning his discharge is not a dispute growing out of the interpretation or application of the collective bargaining agreement and, therefore, is not a grievance or dispute subject to the RLA's arbitral mechanism.

The second question is whether the airline pilot and the Union, in claiming that his employer, CareFlite, during his employment, wrongfully denied him an extension and adequate time to prepare for the ATP test, thus treating him in a less favorable manner than required by the CBA in retaliation for his having prevailed in a prior arbitration proceeding, may seek redress through the RLA's arbitral mechanism. Because the CBA does not expressly or implicitly exclude this dispute from the grievance and arbitration mechanism, and this question calls for an interpretation and application of the CBA, we conclude that the pilot and the Union may seek redress through the RLA's arbitral mechanism to resolve this dispute.

# I. BACKGROUND

CareFlite is a non-profit medical air transportation company operating the largest emergency medical helicopter service in North Texas, with six medical transport helicopters operating from five bases in the Dallas-Fort Worth area. As of the time of the events giving rise to this lawsuit, CareFlite employed 18 helicopter pilots; CareFlite's pilots have been represented by the Union since 2001. CareFlite and the Union are parties to a collective bargaining agreement ("the CBA") that is effective from April 6, 2006 until April 6, 2011. The CBA requires that all of the pilots in the bargaining unit acquire an ATP, the FAA's highest pilot certification. At the time the CBA was negotiated, only a few CareFlite pilots already possessed ATPs. The CBA required CareFlite to provide an ATP training class for its pilots and specified that pilots employed by CareFlite at the time the agreement was adopted would have one year from the date of this training class to obtain their ATPs. Finally, the CBA included the following clause: "termination of employment resulting from a pilot's failure to obtain an ATP within the time requirements of this section is non-grievable and non-arbitrable." CBA Art. 12(1). The CBA also included a clause stating that "[a] termination of employment [for failure to complete required training or certification, which includes a termination for failure to obtain or have an ATP] is non-grievable and non-arbitrable." CBA Art. 13(4).

Craig Lee Hilton began working as a pilot for CareFlite on December 10, 1998. Beginning in November 2005, Hilton served as the CareFlite Committee Chairman for OPEIU Local 108, the highest union position in the CareFlite bargaining unit. On January 12, 2006, Hilton, in his capacity as a union representative, informed Raymond Dauphinais, CareFlite's Vice President and Director of Operations, that the pilots were concerned, for reasons the record does not disclose, about CareFlite's choice of employee for the position of

Aviation Training Manager. On June 6, 2006, CareFlite discharged Hilton, purportedly due to incidents involving interpersonal conflict and lack of judgment. The Union filed a grievance relating to that discharge, alleging that CareFlite was retaliating against Hilton for his union activity, and the arbitrator ordered Hilton reinstated on the grounds that CareFlite did not have cause to terminate him.

The arbitrator gave CareFlite two weeks to reinstate Hilton. CareFlite offered Hilton reinstatement at the end of the two-week period, on Friday, April 20, 2007. Hilton accepted. On Friday, May 4, 2007, CareFlite told Hilton to report for training on Monday, May 7, 2007, his first day of work following reinstatement. Upon returning to work Hilton and the Union, on his behalf, asked various members of CareFlite's management whether Hilton would be given an additional ten months (the time he was out of work) to complete his ATP requirement, given that, due to the improper discharge, he had not been employed by CareFlite for most of the year the other pilots had had to obtain their ATPs. CareFlite management indicated it would not grant any such extension, because Hilton could have obtained his ATP during the time he was discharged or after the arbitrator ordered his reinstatement, or could still obtain it by the deadline. The Union filed a grievance on May 15, 2007, based on CareFlite's unwillingness to extend the ATP deadline for Hilton ("time extension grievance"), accusing CareFlite of retaliating against Hilton for prevailing in the arbitration. CareFlite denied the grievance and maintains that it is not arbitrable under the CBA.

On May 26, 2007, the deadline for acquiring an ATP by "current" pilots under the CBA, CareFlite discharged Hilton for not possessing the certification. On June 1, 2007, the Union filed a grievance challenging Hilton's discharge and seeking reinstatement and an extension of the ATP deadline ("discharge

4

grievance"). CareFlite denied the grievance and maintains that it is not arbitrable under the CBA. On June 4, 2007, CareFlite filed a motion in federal district court seeking a declaratory judgment that both the May 15, 2007, time extension grievance and the June 1, 2007, discharge grievance are not arbitrable and cannot be submitted to arbitration because the CBA provides that "termination of employment resulting from a pilot's failure to obtain an ATP within the time requirements of this section is non-grievable and non-arbitrable." CBA Art. 12(1). The Union and Hilton filed a counterclaim seeking a declaratory judgment that the grievances are arbitrable, or alternatively, seeking judicial relief on independent state and federal law claims for CareFlite's alleged breach of contract and violation of the RLA. The parties filed cross-motions for summary judgment. On July 30, 2008 the district court denied CareFlite's motion for summary judgment and granted the Union and Hilton's motion for summary judgment, ordering that both grievances be submitted to arbitration. The district court did not address any of the remaining claims for breach of contract or violation of the RLA. CareFlite timely appealed.

## II. STANDARD OF REVIEW

We review rulings on motions for summary judgment *de novo*. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538 (5th Cir. 2004). A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When cross-motions for summary judgment have been filed, this court determines whether a genuine issue of material fact exists or whether one party is entitled to prevail as a matter of law. *Shaw Constructors*, 395 F.3d at 539. If the unsuccessful party below is entitled to

prevail as a matter of law, this court will enter judgment for that party. *Id.* at 539 n.9.

## III. DISCUSSION

As the Supreme Court explained in *Hawaiian Airlines*, "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." 512 U.S. at 252 (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987) and 45 U.S.C. § 151a). The RLA therefore "establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes." *Id.* (quoting 45 U.S.C. § 151a). The first class of disputes are those concerning "rates of pay, rules or working conditions": these are "major" disputes. *Id.* "Major disputes relate to 'the formation of collective [bargaining] agreements or efforts to secure them.'" *Id.* (quoting *Consol. Rail Corp. v. Ry Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989)). The second class of disputes are "minor" disputes–these "grow[] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." 45 U.S.C. § 151a. "Minor disputes involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" *Hawaiian Airlines*, 512 U.S. at 253 (quoting *Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 33 (1957)). Thus, the Supreme Court has explained, "major disputes seek to create contractual rights, minor disputes to enforce them." *Id.* at 253 (citing *Consol. Rail*, 491 U.S. at 302, citing *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S., 711, 723 (1945), 65 S.Ct., at 1289).

If the grievances are minor disputes, they "must be resolved only through the RLA mechanisms, including the carrier's internal dispute-resolution processes and an adjustment board established by the employer and the unions."

*Id.* at 253 (citing 45 U.S.C. § 184; *Buell*, 480 U.S. at 563, 107 S.Ct., at 1414; *Consol. Rail*, 491 U.S. at 302, 109 S.Ct., at 2480). To determine whether the grievances in this case constitute a minor dispute we turn first to the Supreme Court's inquiry into the scope of a minor dispute under the RLA.

In *Hawaiian Airlines*, the Court's inquiry into the scope of minor disputes began with the text of the statute. 512 U.S. at 253. Because the statute defines minor disputes to include "disputes . . . growing out of grievances, or out of the interpretation or application of [CBAs]," the Court first considered the argument that this disjunctive language must indicate that "grievances" means something other than labor-contract disputes, else the term "grievances" would be superfluous. *Id.* at 254. Such an argument suggests that "grievances" should be read to mean all employment-related disputes, including those based on statutory or common law. *Id.* The Court rejected that interpretation, however, concluding that "[e]ven if we were persuaded that the word 'or' carried this weight, such an interpretation would produce an overlap not unlike the one it purports to avoid, because that expansive definition of 'grievances' necessarily would encompass disputes growing out of 'the interpretation or application' of CBA's."[1] *Id.* at 253-254. "Thus, in attempting to save the term 'grievances' from superfluity, that overly expansive reading would make the phrase after the 'or' mere surplusage." *Id.* at 254.

The Court thought it more likely that "grievances," like disputes over "the interpretation or application" of CBAs, refers to disagreements over how to give effect to the bargained-for agreement. *Id.* As the Court pointed out, "the use of

_____

[1] The Court cited *United States v. Olano*, 507 U.S. 725, 732, (1993) (reading "error or defect" to create one category of "error") (citing *United States v. Young*, 470 U.S. 1, 15 n.12 (1985)), and *McNally v. United States*, 483 U.S. 350, 358-59 (1987) (second phrase in disjunctive added simply to make the meaning of the first phrase "unmistakable").

'grievance' to refer to a claim arising out of a CBA is common in the labor-law context in general," *id.* (citing *Paperworkers v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987)), and it has been "understood in this way in the RLA context," *Hawaiian Airlines*, 512 U.S. at 254 (citing a Congressional report[2]). "Significantly," the Court added, "the adjustment boards charged with administration of the minor-dispute provisions have understood these provisions as pertaining only to disputes invoking contract-based rights." *Id.* (citing National Rail Adjustment Board decisions and System Boards of Adjustment decisions[3]).

Accordingly, the Court concluded that the most natural reading of the term "grievances" in this context is as a synonym for disputes involving the application or interpretation of a CBA. *Id.* at 255.[4] Further, the Court stated, "[n]othing in the legislative history of the RLA[5] or other sections of the

---

[2]  H.R. Rep. No. 1944, 73d Cong., 2d Sess., 2-3 (1934) (referring to RLA settlement of "minor disputes known as 'grievances,' which develop from the interpretation and/or application of the contracts between the labor unions and the carriers").

[3] The Court cited the following: "*See, e.g.*, NRAB Fourth Div. Award No. 4548 (1987) (function of the National Rail Adjustment Board (Board) is to decide disputes in accordance with the controlling CBA); NRAB Third Div. Award No. 24348 (1983) (issues not related to the interpretation or application of contracts are outside the Board's authority); NRAB Third Div. Award No. 19790 (1973) ('[T]his Board lacks jurisdiction to enforce rights created by State or Federal Statutes and is limited to questions arising out of interpretations and application of Railway Labor Agreements'); *Northwest Airlines/Airline Pilots Assn., Int'l System Bd. of Adjustment*, Decision of June 28, 1972, p. 13 ('[B]oth the traditional role of the arbitrator and admonitions of the courts require the Board to refrain from attempting to construe any of the provisions of the [RLA]'); *United Airlines, Inc.*, 48 LA 727, 733 (BNA) (1967) ('The jurisdiction of this System Board does not extend to interpreting and applying the Civil Rights Act')."

[4] "[T]he word 'or' may be used to indicate 'the synonymous, equivalent, or substitutive character of two words or phrases.'" *Id.* (quoting *Webster's Third New International Dictionary* 1585 (1986)).

[5] "During the debates surrounding the RLA's enactment in 1926, floor statements that, in isolation, could support a broader interpretation of 'grievances' were counterbalanced by

statute[6] undermines this conclusion." *Id.* Further, the Court's case law confirms that the category of minor disputes contemplated by § 151a are those that are grounded in the CBA. The Court has explained that major disputes are those that "arise where there is no [collective agreement] or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Consol. Rail*, 491 U.S. at 302. Major disputes "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Id.* (quoting *Burley*, 325 U.S. at 723).

In *Hawaiian Airlines*, the employee in question, Grant Norris, was an aircraft mechanic who worked for Hawaiian Airlines. Norris notified his supervisors that a damaged axle sleeve on a plane needed to be replaced before it would be safe to fly. His supervisor overruled his recommendation, ordering that the piece be sanded and reinstalled. The plane completed its journey safely but Norris refused to certify that the repair had been performed correctly and

---

other statements – some even by the same legislators – that equated grievances with contract interpretation. *Compare* 67 Cong. Rec. 4517, 8807 (1926), *with id.*, at 4510, 8808. This inconclusive debate hardly calls for fashioning a broad rule of pre-emption. Moreover, in 1934 when Congress amended the RLA to make arbitration mandatory for minor disputes, the accompanying House Report stated that the bill was intended 'to provide sufficient and effective means for the settlement of minor disputes known as "grievances," which develop from the interpretation and/or application of the contracts between the labor unions and the carriers, fixing wages and working conditions.' H.R. Rep. No. 1944, 73d Cong., 2d Sess., 2-3 (1934)." 512 U.S. at 255 n.4.

[6] "Petitioners cite the statute's reference to the parties' general duties as including 'settl[ing] all disputes, whether arising out of the application of [collective bargaining] agreements or otherwise.' 45 U.S.C. § 152 First. This provision, which is phrased more broadly than the operative language of § 153 First (I), does not clearly refer only to minor disputes. But even if this provision is read to require parties to try to settle certain issues arising out of the employment relationship but not specifically addressed by the CBA, this does not compel the conclusion that all issues touching on the employment relationship must be resolved through arbitration or that all claims involving rights and duties that exist independent of the CBA are thereby pre-empted. Our precedents squarely reject this pervasive pre-emption." 512 U.S. at 255 n.5 (alterations in original).

that the plane was fit for flight. Norris was suspended and invoked the grievance procedure contained in the CBA between Hawaiian Airlines and Norris' union. The hearing officer terminated Norris for insubordination; Norris subsequently appealed his termination. No appeal hearing was held, but Norris filed suit in state court. 512 U.S. at 248-52.

Eventually the Supreme Court granted certiorari to resolve the question of whether Norris' state-law wrongful-discharge tort claims were preempted by the RLA. The Court noted that the right Norris asserted – not to be wrongly discharged for his whistleblowing activities – arose solely from state law, from an independent duty not created by the CBA. *Id.* at 258. Thus "[t]he parties' obligation under the RLA to arbitrate disputes arising out of the application or interpretation of the CBA did not relieve petitioners of this duty." *Id.* In other words, the Court held that the RLA's mandatory arbitration mechanism does not apply to all disputes between an employer and its employees, or even to all non-major disputes between an employer and its employees, but only to those rights which arise from the provisions of a CBA. The assertion of any right that is not created by a CBA is therefore not subject to binding arbitration under the statute. *See id.*[7] Norris' state-law claim against Hawaiian Airlines for wrongful discharge was therefore not subject to mandatory arbitration. *Id.* at 266.

In so holding, the Court relied not only on the foregoing analysis, but also on its preemption doctrine, developed in the context of both the RLA and other labor relations statutes. The Court noted that it had previously held that "the RLA's mechanism for resolving minor disputes does not pre-empt causes of

---

[7] *See also Air Line Pilots Ass'n, Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 92-95 (D.C. Cir. 1988) (rejecting union's argument that RLA arbitration requirements cannot be waived or bargained away because the purpose of an arbitration board under the RLA is to decide disputes arising out of the CBA, and if a CBA specifically excludes an issue from arbitration or grievance, then a claim based on that issue cannot be said to arise from it).

action to enforce rights that are independent of the CBA." *Id.* at 256 (citing *Missouri Pac. R. R. Co. v. Norwood*, 283 U.S. 249, 258, 51 S.Ct. 458, 462, 75 L.Ed. 1010 (1931)). Thus, "substantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA," even if some of the same factual issues are involved. *Id.* at 257. The Court found further confirmation of its approach in its cases applying the "virtually identical . . . pre-emption standard the Court employs in cases involving § 301 of the [Labor Management Relations Act]." *Id.* at 260 (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985)) and *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988)). The Court also noted that it had previously applied such preemption analysis to cases involving wrongful discharge, *see id.* (citing *Andrews v. Louisville & Nashville R.R. Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972)), and thus held that Norris' claim against Hawaiian Airlines for breach of state law was not preempted by the RLA, 512 U.S. at 266.

The framework of *Hawaiian Airlines* controls our analysis here. The Union argues that the grievances constitute a minor dispute that must be referred to arbitration. In so doing, the Union argues that the provision in the CBA barring the grievance of discharges based on failure to obtain an ATP within the specified time period is void because it violates the RLA.[8] Under the rationale of *Hawaiian Airlines*, the Union's effort to compel arbitration on the June 1, 2007, discharge grievance must be rejected. The Union and CareFlite agreed to a CBA excluding discharges arising from failure to obtain an ATP from arbitration and the grievance process. The text of the CBA to this effect states "termination of

---

[8] Without the exemption, the Union argues the discharge would be grievable as violating the "just cause" discharge provision in Article 22, Section 2 of the CBA and the anti-discrimination/retaliation provision in Article 3, Section 2 of the CBA.

employment resulting from a pilot's failure to obtain an ATP within the time requirements of this section is non-grievable and non-arbitrable." The CBA is unambiguous on this point and is not capable of a construction that allows for arbitration of discharges for failure to obtain an ATP. The Union's argument that the dispute is a minor one, therefore, is "frivolous" and "obviously insubstantial." *See Consol. Rail*, 491 U.S. at 307.  The CBA does not give rise to any right to grieve a discharge based on a pilot's failure to timely obtain an ATP certificate – in fact, the CBA expressly negates any such right or grievance. Further, because the CBA expressly contemplates such ATP-related discharges and excludes them from arbitration, Hilton's termination is not "independent" from the CBA for the purpose of determining whether Hilton may yet bring claims under state or federal law, unless such state or federal claims arise from rights created elsewhere than in the CBA.

Thus, as the Union rightly perceives, its only hope to compel arbitration concerning the June 1, 2007, discharge grievance is to convince us to invalidate the clause in the CBA that prohibits grievance of a discharge based on failure to obtain an ATP. Contrary to the picture painted by the Union and the district court, however, most of our sister circuits recognize that unions and employees can contract to exempt certain claims from arbitration through their bargained-for CBAs. *See Air Line Pilots Ass'n, Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 92-95 (D.C. Cir. 1988); *Whitaker v. Amer. Airlines, Inc.*, 285 F.3d 940, 946-47 (11th Cir. 2002) (holding that where parties had excluded probationary pilots from grieving discharge during probationary period plaintiff could point to no provision of CBA that was violated by his discharge and thus the claim did not arise under the CBA and was not a minor dispute subject to arbitration); *In re Contintental Airlines, Inc.*, 484 F.3d 173, 183 (3d Cir. 2007) ("The RLA does not dispense with the preliminary question of arbitrability," and therefore court

must examine CBA to see whether parties have agreed to arbitrate dispute in question). *See also Bonin v. American Airlines*, 621 F.2d 635 (5th Cir. 1980) (recognizing that RLA's arbitration provisions apply only to disputes that arise from the terms of agreement in a CBA, not to every dispute between an employer and a union); *Air Line Pilots Ass'n v. Northwest, Inc.,* 627 F.2d 272 (D.C. Cir. 1980) (same). *But see Bowe v. Nw. Airlines, Inc.*, 974 F.2d 101, 103 (8th Cir. 1994) (holding without further explanation that unquoted CBA provision "referring [ERISA] disputes to federal court" did not preempt RLA's mandatory arbitration requirements).

The Union argues categorically, and the district court agreed, that arbitrability principles developed by the Supreme Court under the National Labor Relations Act, 45 U.S.C. § 151 et seq. ("NLRA"), cannot be applied to cases or disputes under the RLA. The Union overlooks, however, an important instance in which the Court clearly did so. In *Hawaiian Airlines,* the Court, as discussed previously, explicitly extended its NLRA preemption doctrine to the RLA, noting that while the two statutes "are not identical . . . the common purposes of the two statutes, the parallel development of RLA and NLRA preemption law, and the desirability of having a uniform common law of labor law preemption support the application [of NLRA preemption doctrine] in RLA cases as well." *Hawaiian Airlines*, 512 U.S. at 263 n.9. Other courts have also recognized this similarity. *See Indep. Ass'n of Cont'l Pilots v. Cont'l Airlines*, 155 F.3d 685, 695 n.8 (3d Cir. 1998) (explaining that "the 'procedural arbitrability' doctrine . . . long a mainstay of NLRA jurisprudence, has been held applicable to RLA cases by other courts of appeals as well" and listing cases).[9]

---

[9] The Supreme Court's opinion in *International Ass'n of Machinists, AFL-CIO v. Central Airlines*, 372 U.S. 682 (1963), cited by the district court, conveys the history of the RLA and its general purpose of streamlining and settling labor disputes between railroad unions and

In sum, an air carrier and its employees' union may, under basic contract and arbitration principles, agree to exclude certain disputes from grievance and arbitration. *See, e.g. Delta Air Lines*, 863 F.2d at 92-95. Once the parties have agreed to do so, any excluded dispute does not arise from any right conferred by the CBA. In this case, the parties agreed through the CBA's Arts. 12(1) and 13(4) to exclude terminations for failure to obtain an ATP from the arbitration process, and thus a dispute over a termination for failure to obtain an ATP does not arise from any right conferred by the CBA. With this backdrop in mind, we proceed to examine the differences between the two grievances.[10]

---

employers. The Union asks us to focus our decision solely on the Congressional purpose of uniform dispute resolution in the railroad industry as described by *Central Airlines*. The problem is that subsequent Supreme Court precedent has made perfectly clear that the principles of contract interpretation developed under the LMRA apply to cases arising under the RLA, and we thus must apply them here. *See, e.g. Hawaiian Airlines*, 512 U.S. at 260; *Lueck*, 471 U.S. at 20; *Lingle*, 486 U.S. at 408.

The Union, and the district court, also place inordinate weight on *Capraro v. United Parcel Service Co.*, 993 F.2d 328, 335-36 (3rd Cir. 1993), in which the Third Circuit held that a CBA cannot exempt entire categories of employees from the RLA grievance process and that therefore a clause exempting probationary pilots from grieving their discharges might properly deprive such pilots of any substantive right but could not deprive them of the procedural right to take their concededly meritless claim to the SBA. The Third Circuit, however, although it has not explicitly overruled *Capraro*, has subsequently held repeatedly that the question of what the parties decided to arbitrate is for a court to decide. *Continental Pilots*, 155 F.3d at 692 (holding that question of what the parties agreed to arbitrate is one for court to consider in RLA case); *see also In re Contintental Airlines, Inc.*, 484 F.3d 173, 183 (3d Cir. 2007). Further, our own circuit has adopted and affirmed the reasoning of a district court opinion holding that a CBA could validly exclude probationary pilots – the same class at issue in *Capraro* – from grieving their discharges through arbitration by the SBA. *Texas Int'l Airlines, Inc. v. Assoc. of Flight Attendants*, 667 F.2d 1169 (5th Cir. 1982), *affirming Texas Int'l Airlines, Inc. v. Assoc. of Flight Attendants*, 498 F. Supp. 437 (S.D. Tex. 1980).

[10] The parties agreed to have the district court determine the arbitrability of each of the two grievances and its underlying dispute at the same time. The parties did not agree to combine them for any other purpose; and the court did not judicially order them to be consolidated. *See* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2382 (3d ed. 2008 & Supp. 2009). In fact, despite this agreement the parties briefed the grievances separately in their summary judgment motions to the district court. Accordingly, the parties' agreement to have the matters considered and decided together did not affect the

The CBA defines a grievance as "a dispute with respect to the interpretation or application of this Agreement." CBA, Art. 23(1). As Art. 23(2) of the CBA provides, a written grievance is composed of three parts: "(1) the relevant facts, (2) the contract provisions alleged to have been violated, and (3) the specific remedy requested." In this case, two grievances were filed reflecting two separate and distinct disputes with respect to the interpretation or application of the Agreement.

The May 15, 2007, time extension grievance (1) alleges that Hilton was not properly paid or given enough time to obtain an ATP, was treated in a retaliatory manner, and was threatened with termination for failure to obtain an ATP; (2) lists Articles 1, 3, 12 (in the text of the facts alleged), 19, 22, 23, and 24 as the provisions violated; and (3) demands that Hilton be made whole for lost wages and benefits from April 30, 2007, and be given an extension of at least six months to obtain his ATP.

The June 1, 2007, discharge grievance, filed after Hilton's termination, repeats some of the same allegations, but, more importantly, it (1) alleges that CareFlite wrongfully terminated Hilton on May 27, 2007; (2) lists the same provisions of the CBA allegedly violated as the May 15, 2007, time extension grievance, and (3) implicity requests, along with back pay and wages, reinstatement. The June 1, 2007, discharge grievance necessarily calls for setting aside Hilton's discharge and reinstating his employment because it calls for giving him a six-month extension to obtain his ATP, which he would need only if employed by CareFlite. Thus, this grievance necessarily calls for an

---

legal nature and effect of each grievance and its underlying dispute under the RLA. *See, e.g.*, *Swift & Co. v. Hocking Valley Ry.*, 243 U.S. 281, 289 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative, since the court cannot be controlled by agreement of counsel on a subsidiary question of law.").

interpretation and application of Articles 12(1) and 13(4).

The differences between the two grievances require that they be considered separately. First, the facts describe two entirely different situations. Hilton's being allegedly unfairly deprived of additional time to obtain an ATP and merely "threatened" with termination for lack of an ATP may or may not have violated a particular right arising from the CBA (the merits of that grievance are for an arbitrator to decide). Also, such a grievance clearly is not excluded by Articles 12(1) or 13(4) because it does not grieve or seek arbitration of a termination dispute. Thus, regardless of its merits, its allegations are grievable ones. But Hilton's termination on May 27, 2007, for failure to obtain an ATP, as the June 1, 2007, discharge grievance alleges, did not violate a right arising from the CBA, because Articles 12(1) and 13(4) make such a termination "non-grievable and non-arbitrable" under our foregoing analysis.

In addition, the relief requested by each of the two grievances is different. The May 15, 2007, time extension grievance requests wages and back pay dating from April 30, 2007. The June 1, 2007, discharge grievance requests wages and back pay from a different date, May 27, 2007. More importantly, the June 1, 2007, discharge grievance implicitly would require reinstatement because it demands that Hilton be given additional time to obtain an ATP, which would only make sense if he were working for CareFlite once again. Thus, the later grievance seeks different relief, *viz.*, reinstatement, and requests back pay and wages for a different period of time. Since, for the reasons previously explained in this opinion, Hilton has no such right under the RLA to grieve his termination for failure to obtain an ATP, he therefore has no right to obtain back pay from the date of his termination, much less to be reinstated, because the termination itself was not grievable or arbitrable under the RLA. (And of course he has no right to an additional six months to obtain an ATP because he has no right to

grieve for his job back.) Consequently, the Union cannot compel arbitration on the June 1, 2007, discharge grievance. *See Hawaiian Airlines*, 512 U.S. at 266.

But the May 15, 2007, time extension grievance is a different matter. It is beyond dispute that had Hilton filed only the May 15, 2007, time extension grievance, it would be arbitrable under the RLA. Thus, there is no reason that his filing the non-grievable June 1, 2007, discharge grievance should interfere with the independent interpretation and application of the grievable May 15, 2007, time extension grievance. Further, the CBA does not limit the number of grievances an employee can file. Thus there is no legal or common sense reason that Hilton should lose his right to arbitrate his first valid grievance simply because he later filed a second grievance that is not arbitrable. Pursuant to Hilton's April 15, 2007, grievance, he may have a right to have CareFlite's treatment of him with respect to adequate time to prepare for the ATP test declared unfair, unjust, and discriminatory; to be made whole for any lost wages and benefits between April 30, 2007, and May 27, 2007; and any other relief lawful and feasible under the RLA and the CBA, depending on how the arbitrator construes the request for relief and its merits. While the merits of Hilton's first grievance are not for us to decide, Hilton has a right to have those claims decided by an arbitrator as the CBA provides.

### IV. CONCLUSION

The June 1, 2007 discharge grievance was validly excluded from arbitration pursuant to CBA Article 12, Section 1. The May 15, 2007 grievance, however, was not so exempted and is therefore subject to arbitration. Any independent state or federal law claims Hilton has against CareFlite for its treatment of him that do not arise from the CBA and are not governed by the RLA arbitration requirements, to the extent the district court finds that any exist, may be considered in due course by the district court on remand. *See*

*Hawaiian Airlines*, 512 U.S. at 258-66. For the foregoing reasons we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

JENNIFER WALKER ELROD, Circuit Judge, concurring.

I concur in Judge Dennis's ultimate conclusions that (1) the May 15, 2007 grievance is arbitrable, and (2) the June 1, 2007 grievance is not arbitrable because it was validly excluded from arbitration pursuant to Article 12, Section 1 of the CBA. I, however, would analyze the June 1, 2007 grievance in the same manner as did the district court—as a minor dispute arising from the interpretation of the CBA. But because the RLA does not prohibit CareFlite and the Union from agreeing to exclude certain minor disputes from arbitration, I would hold that the June 1, 2007 grievance challenging Hilton's termination is not arbitrable. *See Tex. Int'l Airlines, Inc. v. Ass'n of Flight Attendants*, 667 F.2d 1169 (5th Cir. 1982) (per curiam) (affirming without opinion the district court's judgment that the RLA did not invalidate an agreement between an air carrier and its employees that excluded probationary employees from utilizing the grievance procedures to challenge a disciplinary action or discharge); *see also Tex. Int'l Airlines, Inc. v. Ass'n of Flight Attendants*, 498 F. Supp. 437, 448 (S.D. Tex. 1980).